**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-291-2 (ABJ)** |
| | : | |
| **ALBUQUERQUE COSPER HEAD,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S MEMORANDUM IN SUPPORT OF PRE-TRIAL DETENTION**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum in support of its oral motion in the Eastern District of Tennessee that the defendant, Albuquerque Cosper Head, be detained pending trial. The government maintains that the defendant should be detained pending trial pursuant to 18 USC 3142(f)(2)(A) (Serious Risk of Flight), 18 USC 3142(f)(2)(B) (Serious Risk to Obstruct Justice), and 18 USC 3142(d)(1)(A)(iii) (Temporary Detention to Permit Revocation of Probation or Parole) of the federal bail statute. The government respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities presented at the detention hearing, be considered in the Court's determination regarding pre-trial detention.

**PROCEDURAL HISTORY**

The defendant is charged by indictment with one count of Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and 2; two counts of Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); one count of Assaulting, Resisting, or Impeding Certain Officers or Employees, in violation of 18 U.S.C. § 111(a)(1); one count of Knowingly Entering or Remaining in any Restricted Building or Grounds, in violation of 18 U.S.C.

§ 1752(a)(1); one count of Disorderly and Disruptive Conduct in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); one count of Impeding Ingress and Egress in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(3); one count of Engaging in Physical Violence in any Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4); one count of Impeding Passage Through the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(E); and one count of Violent Entry and Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(F).

On April 14, 2021, during the defendant's initial appearance in the Eastern District of Tennessee, the government made a motion to detain the defendant without bond pending trial. The defendant waived his detention hearing under the condition that a detention hearing would be held in the charging jurisdiction and was ordered committed to the District of Columbia.

At the arraignment and initial appearance in Washington D.C. scheduled for April 30, 2021, the government intends to orally move for detention pending trial pursuant to the above-referenced provisions of the federal bail statute, and any additional provisions that may apply upon review of the Pretrial Services Agency report.

## FACTUAL BACKGROUND

### I. The Attack on the United States Capitol on January 6, 2021.

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint

session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence ("Vice President Pence") was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol ("the Capitol"). Temporary and permanent barricades were in place around the exterior of the Capitol building, and U.S. Capitol Police ("USCP") were present and attempting to keep the crowd away from the Capitol building. The certification proceedings were still underway, and the exterior doors and windows of the Capitol were locked or otherwise secured. Members of the USCP attempted to maintain order and keep the crowd from entering the Capitol; however, shortly after 2:00 p.m., individuals in the crowd forced entry into the Capitol, including by breaking windows and by assaulting members of the USCP, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, the joint session of the United States Congress was effectively suspended until shortly after 8:00 p.m. Vice President Pence remained in the Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

## II.     The Attack of Officer M.F. and Others

On January 6, 2021, the USCP requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol,

impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer M.F.

Shortly before 3:00 p.m., protesters had engulfed the west side of the Capitol and were climbing on the scaffolding in front of buildings as well as various features of the building. Although the Capitol had already been breached and rioters had flooded in through several entrances, a group of MPD officers and members of the USCP and other agencies called to assist were able to hold their position and deny entry through the prominent entrance of the lower west terrace—the doorway through which the President typically arrives during the inauguration. To enter the Capitol through the lower west terrace, one must walk through an arch and a short tunnel with a two sets of glass doorways, as pictured below in a photo from the evening of January 6, 2021 and a subsequent photo taken on January 13, 2021.





The violence the mob inflicted on officers defending the lower west terrace was particularly heinous. MPD Officer M.F. was one such officer. That afternoon, Officer M.F., wearing full MPD uniform and equipped with a body-worn camera, responded to a radio call for assistance at the Capitol, where he became involved in the effort to push back rioters from the doorway pictured above. While Officer M.F. was defending the doorway, the defendant, Albuquerque Head, pulled Officer M.F. into the crowd, where members of the crowd attacked and beat the officer. Daniel Rodriguez[1] tased Officer M.F., Thomas Sibick[2] robbed Officer M.F. of his MPD badge and police radio, and Kyle Young[3] tried to forcibly remove Officer M.F.'s service weapon from its fixed holster while yelling words to the effect that he was going to take Officer M.F.'s gun and kill him. Following the assault, Officer M.F. lost consciousness and was hospitalized for his injuries, including a likely concussion, injuries from the taser, and for monitoring of his cardiac activity.

### III.    Albuquerque Cosper Head's Criminal Conduct

The defendant participated in the violent effort to breach the Capitol while Congress was certifying the results of the 2020 Presidential Election. Surveillance video from January 6, 2021 showed that the defendant joined the effort to gain entry into the Capitol by advancing into the tunnel on the lower west terrace toward the glass doorway that leads inside. At that time, a group of USCP and MPD officers had formed a police line at that doorway to prevent the mob from entering the building through that entrance. Surveillance video shows the defendant in the tunnel around 3:14 p.m. near the police line, which was not visible on camera at that time, taking riot

---

[1] *U.S. v. Daniel Rodriguez*, 1:21-cr-00246-ABJ (related case)
[2] *U.S. v. Thomas Sibick*, 1:21-cr-00291-ABJ-1 (co-defendant)
[3] *U.S. v. Kyle Young*, 1:21-cr-00291-ABJ-3 (co-defendant)

shields from other rioters and placing a shield in front of himself. See, screenshot in Figure 1 below. Additionally, an open source YouTube video[4] shows the defendant using riot shields to strike toward the police line. See, screenshot in Figure 2 below.



Figure 1

---

[4] See, time stamp 22:29: https://youtu.be/cJOgGsC0G9U



Figure 2

At approximately 3:15pm, Officer M.F. came to the front of the police line at the door to the entrance on the lower west terrace of the Capitol. At around this time, as shown on the YouTube video, the defendant used a riot shield to push against Officer M.F. and other officers at the front of the police line. See, Figure 3 and Figure 4 below.



Figure 3



Figure 4

At approximately 3:18 p.m., as officers began to push the rioters back from the doors, the defendant wrapped his arm around Officer M.F.'s neck and pulled Officer M.F. through the tunnel and into the crowd of rioters outside of the steps to the tunnel. See, screenshots of surveillance, Figure 5 and Figure 6, below.



Figure 5



Figure 6

The defendant can also be heard on Officer M.F.'s body worn camera ("BWC") saying "I'm gonna try to help you out here. You hear me?" and then "Hey! I got one!" In an interview with FBI agents on February 24, 2021, Officer M.F. described the individual who grabbed onto Officer M.F. and wrapped him up into a bear hug while dragging him out of the tunnel. Officer M.F. also indicated that the individual kept telling Officer M.F. that he would take care of him once they got outside but at no point did Officer M.F. think that the individual was going to help him or take care of him. Additional video obtained by the FBI shows the defendant dragging Officer M.F. through the crowd. See, screenshot in Figure 7 and Government Exhibit 2.



Figure 7

After the defendant pulled Officer M.F. into the crowd, other rioters assaulted him, including Daniel Rodriguez, who tased Officer M.F., Thomas F. Sibick, who robbed Officer M.F. of his MPD badge and police radio, and Kyle J. Young, who tried to forcibly remove Officer M.F.'s service weapon from its fixed holster while stating words to the effect that he was going to take Officer M.F.'s gun and kill him.

Following the attack on the U.S. Capitol on January 6, 2021, FBI agents identified a Twitter account @HeadAlbuquerque, for which the phone number used to verify the account is associated with the defendant and the IP address through which the account was created was linked to Kingsport, Tennessee, which is the defendant's city of residence. On January 8, 2021,

12

@HeadAlbuquerque stated the following in response to a photo of the breach of the interior of the U.S. Capitol, "He is seen here with several known antifa members I was in DC and "at" the capital and went to all confederate flags I seen because I'm son of Confederate veterans never seen this guy." See, Figure 8 below.



Figure 8

Subsequently, on January 10, 2021, @HeadAlbuquerque stated the following in response to a video posted by @DanScavino on 6 January 2021 of what appears to be a view of the crowds at the US Capitol, "Proud to have been their." See, Figure 9 below.

13



Figure 9

*Identification of Albuquerque Cosper Head*

On January 9, 2021, a detective with MPD contacted Officer M.F., who advised that he had been sent multiple videos of the Capitol incident. In one video that he viewed, he observed individuals that assaulted him. In particular, Officer M.F. identified the person who "bear hugged" him, who stated something to the effect of "I got one," and was wearing a gray bandana on his face that came down and a gray lucky 12 shirt.[5] The detective provided Officer M.F. his contact information and asked Officer M.F. to send him the video and still shot. Officer M.F. then sent the detective the below screenshot. See, Figure 10.

---

[5] As shown on video footage, the shirt actually said "Lucky 13."



Figure 10

Additionally, law enforcement created a "be on the look-out" ("BOLO") using a screenshot from the YouTube video to identify the individual that dragged Officer M.F. into the crowd. See, Figure 11 and Figure 12 below.[6]



Figure 11

---

[6] During the course of the investigation, law enforcement received multiple additional tips from around the country of people providing information about who they believed BOLO 111-AFO to be. Law enforcement received at least 10 tips indicating that Photograph 111 looked like various individuals that are not Albuquerque Cosper Head. Thus far, law enforcement is not aware of any corroboration for these tips and is not aware of any evidence linking those individuals to the Capitol on January 6, 2021.



## ASSAULT ON FEDERAL OFFICERS AND VIOLENCE AT THE UNITED STATES CAPITOL

**WASHINGTON, D.C.**
**JANUARY 6, 2021**



Photograph #111-AFO    Photograph #63-AFO    Photograph #112-AFO    Photograph #113-AFO

Photograph #114-AFO    Photograph #115-AFO    Photograph #116-AFO

### DETAILS

The Federal Bureau of Investigation's (FBI) Washington Field Office is seeking the public's assistance in identifying individuals who made unlawful entry into the United States Capitol Building and assaulted law enforcement personnel on January 6, 2021, in Washington, D.C.  The FBI is seeking the public's assistance in identifying these individuals involved in the assault of DC Metropolitan Police Officer Mike Fanone.

Anyone with information regarding these individuals, or anyone who witnessed any unlawful violent actions at the Capitol or near the area, is asked to contact the FBI's Toll-Free Tipline at 1-800-CALL-FBI (1-800-225-5324) to verbally report tips. You may also submit any information, photos, or videos that could be relevant online at fbi.gov/USCapitol. You may also contact your local FBI office or the nearest American Embassy or Consulate.

When calling to provide a tip on one of these individuals, please reference the above photo number, including the AFO.

**Field Office:** Washington D.C.

www.fbi.gov

Figure 12

On March 8, 2021, FBI agents interviewed a Probation and Parole Officer for the Tennessee Department of Corrections, PPO-1. PPO-1 looked at the photograph in Figure 11 above and indicated IT was 100% sure Albuquerque Cosper Head is the person in the photograph. PPO-1 reported that IT became the defendant's probation officer in 2017 and would conduct face-to-face meetings every 3 months and 2 residential checks per year. PPO-1 reported that IT last saw the defendant on January 20, 2021.

16

On March 11, 2021, FBI agents interviewed another Probation and Parole Officer for the Tennessee Department of Corrections, PPO-2.  PPO-2 also viewed the photograph in Figure 11 above and said IT was 95% sure that was the defendant, Albuquerque Cosper Head. According to PPO-2, the defendant does not usually have hair that long but the facial features were definitely his. PPO-2 reported that IT has known the defendant for approximately 5 years and saw him in person approximately 4 times per year during that time. PPO-2 reported that Head's last home visit was on October 12, 2020.

## ARGUMENT

As a preliminary matter, the "rules concerning the admissibility of evidence in criminal trials do not apply to the presentation and consideration of information at the [detention] hearing." 18 U.S.C. § 3142(f). Specifically, the presentation of hearsay evidence is permitted. *Id.*; *United States v. Smith*, 79 F.3d 1208, 1210 (D.C. Cir. 1996). Moreover, the government is not required to "spell out in precise detail how the government will prove its case at trial, nor specify exactly what sources it will use." *United States v. Martir*, 782 F.2d 1141, 1145 (2d Cir. 1986); *United States v. Williams*, 798 F. Supp. 34, 36 (D.D.C. 1992). A pretrial detention hearing should not be used as a discovery device and cross-examination should be limited to the disputed issues, since the detention hearing is not to be turned into a mini-trial and is not to be used as a subterfuge to obtain discovery. *Smith*, 79 F.3d at 1210; *see also Williams*, 798 F. Supp. at 36.

In this case, although the government is not seeking a hold pursuant to 18 U.S.C. § 3142(f)(1)(A) (Crime of Violence), it still must argue the appropriate factors under § 3142(g). Whatever the basis for detention, the BRA's plain language does not limit the Court's consideration of the appropriate factors under § 3142(g). Indeed, exactly the opposite: § 3142(g)

17

directs that judges "shall" consider the "available information concerning" the enumerated factors. Similar language in the sentencing and supervised-release statutes, 18 U.S.C. § 3553(a) and § 3583, for example, affords a court "wide discretion" to craft the most appropriate sentence or set of conditions. *See United States v. Hunt*, 843 F.3d 1022, 1030 (D.C. Cir. 2016).

Section 3142(g)'s mandatory language, moreover, articulates no link between the rationale for a detention hearing under either §§ 3142(e) or 3142(f) and the factors a court considers under §3142(g). Instead, once "a hearing is appropriate, the judicial officer *must* consider several enumerated factors to determine" whether detention or release is appropriate. *United States v. Singleton,* 182 F.3d 7, 9 (D.C. Cir. 1999); *see United States v. Holmes,* 438 F.Supp.2d 1340, 1341 (S.D. Fla. 2005) (reasoning that, under *Singleton,* a court "should evaluate all the factors in subsection (g) when making its detention determination . . . regardless of whether detention is sought under [§ 3142] (f)(1) or (f)(2)"); *accord United States v. Plata Hernandez,* 766 Fed. Appx. 651, 656 (10th Cir. 2019) ("The plain language of §3142(f) pertains to what triggers the requirement that a detention hearing be held, not the factors that guide the detention decision. Those factors are listed in § 3142(g), which contains no language limiting the consideration of those factors to hearings held only under subsection (f)(1), not subsection (f)(2)."). [7] Consistent

---

[7] Some out-of-circuit cases appear to follow a different approach. *See e.g. United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988) (holding that dangerousness is not appropriately considered in cases where the basis for detention is 18 U.S.C. § 1342(f)(2)); *United States v. Himler*, 797 F.2d 156 (3d Cir. 1986) (reasoning that the district court could only consider dangerousness in setting conditions of release where the defendant's case involved an offense specified in 18 U.S.C. § 3142(f)(1)). But those cases may simply stand for the unobjectionable rule that "a finding of dangerousness" is not a basis for a detention hearing without satisfying a triggering factor in § 3142(f)(1) and (2) because such an approach would render those provisions "meaningless." *See United States v. Twine*, 344 F.3d 987, 987 (9th Cir. 2003) (citing *Himler* and *Ploof* as supporting that proposition); see also *Singleton*, 182 F.3d at 9 (describing *Ploof* as addressing when a detention hearing is available).

with *Singleton*, therefore, this Court should consider the full panoply of factors when deciding whether to hold the defendant pending trial detention—and, should, for the reasons outlined below, determine that continued detention is appropriate.

There are four factors under Section 3142(g) that the Court should analyze in determining whether to detain Mr. Head pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against Mr. Head; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. § 3142(g). A review and understanding of the facts and circumstances in this case merit the conclusion that there is no condition or combination of conditions that would reasonably assure the appearance of the person as required and the safety of the community. *See* 18 U.S.C. § 3142(e)(1).

## I.       Nature and Circumstances of the Offense

During the January 6, 2021, siege of the U.S. Capitol, multiple law enforcement officers were assaulted by an enormous mob, which included numerous individuals with weapons, bulletproof vests, and pepper spray who were targeting the officers protecting the Capitol.  The defendant is among those who assaulted law enforcement officers.  As Chief Judge Howell stated, "Grave concerns are implicated if a defendant actively threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot, thereby encouraging others to engage in such conduct. These

---

Here, the government does not rely on dangerousness as the basis for a detention hearing. More to the point, however, this Court is bound by *Singleton*'s approach that permits plenary consideration of the §3142(g) factors once the government has satisfied the threshold inquiry under §3142(f) that a detention hearing is appropriate.

factors measure the extent of a defendant's disregard for the institutions of government and the rule of law, qualities that bear on both the seriousness of the offense conduct and the ultimate inquiry of whether a defendant will comply with conditions of release meant to ensure the safety of the community." *United States v. William Chrestman*, 21-mj-218 (ZMF), ECF No. 23, at 16. Indeed, the Court previously evaluated several factors, to include whether a defendant: (1) "has been charged with felony or misdemeanor offenses," (2) "engaged in prior planning before arriving at the Capitol," (3) carried or used a dangerous weapon during the riot, (4) "coordinat[ed] with other participants before, during, or after the riot," or (5) "assumed either a formal or a de facto leadership role in the assault by encouraging other rioters' misconduct," and (6) the nature of "the defendant's words and movements during the riot," including whether he "damaged federal property," "threatened or confronted federal officials or law enforcement, or otherwise promoted or celebrated efforts to disrupt the certification of the electoral vote count during the riot." *Chrestman*, at *7–8. Here, the defendant's behavior is unquestionably concerning. While the evidence does not suggest coordination or pre-planning, the defendant instigated the assault on Officer M.F. by pulling him into the crowd away from the police line and shouted "I got one!" Further, the defendant enthusiastically participated in the violent effort to enter the Capitol unlawfully and then stated on social media that he was proud to have been there.

In *United States v. Munchel*, No. 21-3010, 2021 WL 1149196, at *8 (D.C. Cir. Mar. 26, 2021), the D.C. Circuit held, "In our view, those who actually assaulted police officers and broke through windows, doors, and barricades, and those who aided, conspired with, planned, or coordinated such actions, are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." Further, in *United States v. Jeffrey*

*Sabol*, Judge Emmett G. Sullivan found that "grave concerns" were "implicated by Mr. Sabol's conduct, which included using physical force to strip Officer A.W. of his police baton, assisting other rioters in pulling officer B.M. intro the mob, assaulting Officer B.M. with the baton he had stolen from Officer A.W." which set "him apart from other rioters who engaged with law enforcement but have been granted pretrial release." *Cf United States v. Federico Guillermo Klein*, 21-cr-236 (JDB), ECF No. 29, at 24 (where the defendant's "most forceful conduct was directed to advancing and maintaining the mob's position in the tunnel, not toward inflicting injury…"). Lastly, in co-defendant case *United States v. Thomas Sibick*, Chief Judge Howell detained the defendant pending trial, stating "[e]ven if there is no evidence at this time that the defendant was directly responsible for the officer's injuries," he was "part of the mob assault on the Capitol in which people lost their lives and Congress's constitutional task of counting electoral college votes was disrupted[,]" "and most significantly, defendant appears to have joined in a terrible assault on a police officer, who was dragged into the crowd, beaten and tasered, and had his police property stolen." *United States v. Thomas Sibick*, 21-mj-297 (GMH), ECF No. 12, at 7.

The defendant was involved in one of the most violent assaults on law enforcement officers that occurred on January 6, 2021.  He is facing charges of violating 18 U.S.C. 1512(c)(2) and 2, 18 U.S.C. 111(a)(1), and 18 U.S.C. 231(a)(3), which are serious felony offenses.  His actions – pushing on a riot shield held by officers who were trying to prevent the entry of rioters into the Capitol and then pulling Officer M.F. away from the police line and into the crowd –  resulted in Officer M.F. being tased, robbed, and threatened. Unlike others, who joined in the assault after it began, the defendant was the instigator. Officer M.F. was seriously injured – he suffered a period of unconsciousness, a heart injury, and a possible traumatic brain injury – and could have easily

21

been killed, because of the defendant's actions. Moreover, the defendant's assault of Officer M.F. and his actions in the tunnel of the lower west terrace interfered with officers' ability to protect the doors to the Capitol building on the lower west terrace.

Indeed, the defendant was part of a violent mob that engaged in one of the most intense and prolonged clashes between the rioters attempting to overrun the Capitol on January 6 and the law enforcement officers charged with protecting it.   The defendant repeatedly participated in the violent battle against law enforcement by not only striking toward the police line with a riot shield but also by assisting in creating a shield wall and violently pushing against law enforcement guarding the doors. *See* Government Exhibit 1. The defendant's actions prove he is a danger to the community at large, whose safety can only be assured by his detention.

Accordingly, consistent with *Sibick, Chrestman*, *Munchel*, and *Sabol*, the nature and circumstances of the defendant's offenses weigh strongly in favor of the defendant's pre-trial detention.

## II.    Weight of the Evidence

The second factor to be considered, the weight of the evidence, also weighs in favor of detention. The evidence against Mr. Head is strong and compelling. As noted above, the defendant was observed on U.S. Capitol surveillance cameras, social media videos, and other footage attacking law enforcement officers and attempting to unlawfully enter the U.S. Capitol. He was identified by two of his probation officers in photographs from the video footage.  He has now been indicted by a Grand Jury.  The evidence against this defendant is overwhelmingly strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

### III.     History and Characteristics

The third factor, the history and characteristics of the person, similarly weighs in favor of detention. Upon information and belief, the defendant has an extensive criminal history including arrests dating back to 1997 and at least the following convictions:

- Possession of Marijuana, Running Red Light, Evading Arrest (Kingsport, Tennessee, 1999).
- Domestic Assault and Reckless Endangerment (Kingsport, Tennessee, 2001)
- Possession of Marijuana (Kingsport, Tennessee, 2001).
- Driving on a Revoked, Suspended, or Cancelled License, Attempted Auto-Burglary, Resisting Arrest (Kingsport, Tennessee, 2002).
- Driving on Revoked, Suspended or Cancelled License and Unlawful Possession of a Weapon (Hawkins County, Tennessee, 2003).
- Driving Under the Influence of Drugs and Driving on Revoked, Suspended or Cancelled (Rogersville, Tennessee, 2003).
- Assault (Kingsport, Tennessee, 2005).
- Assault (Kingsport, Tennessee, 2006).
- Driving Under the Influence of Drugs/Alcohol and Driving on a Revoked Suspended License (Kingsport, Tennessee, 2007).
- Domestic Assault (Kingsport, Tennessee, 2009).
- Driving Under the Influence of Drugs/Alcohol, Driving on a Revoked/Suspended License, Simple Possession/Casual Exchange, Evading Arrest (Kingsport, Tennessee, 2009).
- Simple Possession/ Casual Exchange and Contributing to Delinquency of a Minor (Lenoir City, Tennessee, 2011).
- Theft (Up to $500) (Kingsport, Tennessee, 2014).
- Vandalism (Up to $500) and Public Intoxication (Kingsport, Tennessee, 2014).
- Theft of Property $1000-$10,000 and Possession of Unlawful Drug Paraphernalia (Blountville, Tennessee, 2014).
- Driving Under the Influence – 2nd Offense and Driving While License Revoked – 3rd Offense (Case No. 40844) (Jonesborough, Tennessee, 2015).

The defendant's criminal history is concerning and includes prior assaultive conduct, failures to appear, and violations of probation. Further, according to a Tennessee Department of Corrections officer, the defendant's probation in Case No. 40844 was scheduled to expire on April

30, 2021, however, based on the conduct in the instant offense, the officer anticipates filing a violation of probation. Accordingly, the defendant was on probation and did not have permission to travel outside of the state of Tennessee at the time of the instant offense. Given the defendant's prior criminal history and the fact that he was on probation when he participated in the riot at the Capitol on January 6, 2021, there can be no assurance of the defendant's return to Court and the safety of the community if he is released. Accordingly, this factor weighs heavily in favor of detention.

## IV.     Danger to the Community

The fourth factor, the nature and seriousness of the danger to any person or the community posed by a defendant's release, also weighs in favor of the defendant's detention. The defendant is charged with violent and assaultive conduct. He tenaciously participated in a mob bent on obstructing Congress from certifying the election results. Most disturbingly, the defendant assaulted Officer M.F. while the officer was defending the Capitol, then dragged him into a frenzied mob who brutally attacked the officer and threatened his life. Officer M.F. lost consciousness and required hospitalization. The danger that the defendant poses is exacerbated by the fact that he not only showed a lack of remorse for his violent actions but posted on Twitter that he was proud to be there. *See supra* Figure 9.

In addition, the defendant's willingness to travel out-of-state, while on probation, to participate in this violent attack is particularly indicative of his dangerousness to the community. An individual on probation should be on his best behavior, trying to prove to the court that he should remain in the community.  The defendant did the complete opposite, and as such, it is hard

to imagine what new set of conditions could assure the safety of the community from his future dangerous actions.

The weight of the factors all individually favor detention. Given the above assessment of all four relevant factors, there are no conditions or combinations of conditions that can effectively ensure the defendant's appearance in court as required and the safety of the community. This is especially so when the defendant's obstruction occurred at the U.S. Capitol while he was on probation for another offense and did not have permission to travel outside of the state of Tennessee.

## **<u>CONCLUSION</u>**

WHEREFORE, the United States respectfully requests that the Court grant the government's motion to detain the defendant pending trial.

Respectfully submitted,

CHANNING D. PHILLIPS
Acting United States Attorney
D.C. Bar No. 415793

*/s/Tara Ravindra*
Tara Ravindra
Assistant United States Attorney
D.C. Bar No. 1030622
555 4th Street, N.W.
Washington, D.C. 20530
Phone: (202) 252-7672
Tara.Ravindra@usdoj.gov

*/s/ Cara Gardner*
Cara Gardner
Assistant United States Attorney
D.C. Bar 1003793
U.S. Attorney's Office

555 4th Street, N.W.
Washington, D.C. 20530
202-252-7009
Cara.Gardner@usdoj.gov

## **<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on April 28, 2021, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

_/s/ Tara Ravindra_
Tara Ravindra
Assistant United States Attorney

26