IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No: 21-cr-291-2 |
| | |
| | 18 U.S.C. § 111(a)(1) |
| v. | |
| | Redacted |
| ALBUQUERQUE HEAD, | |
| Defendant. | |

**FILED**

MAY – 6 2022

Clerk, U.S. District and
Bankruptcy Courts

## STATEMENT OF OFFENSE

Pursuant to Federal Rule of Criminal Procedure 11, the United States of America, by and through its attorney, the United States Attorney for the District of Columbia, and the defendant, Albuquerque Head, with the concurrence of his attorney, agree and stipulate to the below factual basis for the defendant's guilty plea—that is, if this case were to proceed to trial, the parties stipulate that the United States could prove the below facts beyond a reasonable doubt:

### *The Attack at the U.S. Capitol on January 6, 2021*

1. The U.S. Capitol, which is located at First Street, SE, in Washington, D.C., is secured 24 hours a day by U.S. Capitol Police. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by U.S. Capitol Police. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

2. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

3. On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, which is located at First Street, SE, in Washington, D.C. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the United States Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020. The joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.

4. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

5. At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and officers of the U.S. Capitol Police, and the crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials.

6. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of the U.S. Capitol Police attempted to maintain order and keep the crowd from entering the Capitol; however,

shortly after 2:00 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. The riot resulted in substantial damage to the U.S. Capitol, requiring the expenditure of more than $1.4 million dollars for repairs.

7.      Shortly thereafter, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. Accordingly, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *Albuquerque Head's Participation in the January 6, 2021, Capitol Riot*

8.      On January 6, 2021, the U.S. Capitol Police ("USCP") requested assistance from the Metropolitan Police Department ("MPD") and other law enforcement agencies in the area to protect the Capitol, impede more people from entering the Capitol, and expel the crowd that was already inside the Capitol. Multiple MPD officers and other law enforcement officers came to assist, including MPD Officer M.F. The officer was wearing a full Metropolitan Police Department uniform, to include a marked helmet and tactical vest, with his police badge, duty belt, and official insignia clearly displayed.

9.      At approximately 3:00 p.m., a group of USCP and MPD officers had formed a



police line at one of the two glass doorways on the lower west terrace that leads inside the U.S. Capitol building to prevent the mob from entering the building through that entrance. At around 3:14 p.m., the defendant joined the rioters in the lower west terrace archway pushing against the police line. The defendant advanced into the tunnel to the front of the mob near the police line, took riot shields from other rioters, and used the riot shields to strike at the police.

10. At approximately 3:15pm, Officer M.F. came to the front of the police line. At around this time, the defendant used a riot shield to push against officers at the front of the police line and, at one point, struck Officer M.F.'s hand with his own hand.

11. At 3:18:52 p.m., as officers began to push the rioters back out from the archway, the defendant wrapped his arm around Officer M.F.'s neck and pulled him into the crowd of rioters outside the tunnel, yelling, "I got one!" Officer M.F. used his hand to push against the defendant's chest at 3:19:01 p.m., in an effort to break the hold that the defendant had on Officer M.F. The defendant maintained control of Officer M.F. and pulled him further into the crowd for 25 seconds until Officer M.F. successfully pushed the defendant away, and the crush of the crowd separated Officer M.F. and the defendant.

12. After the defendant pulled Officer M.F. into the mob, rioters assaulted, tased, and robbed the officer of his MPD badge and police radio, as well as holding his limbs while trying to remove his service weapon forcibly from its fixed holster. A member of the mob threatened to take Officer M.F.'s gun and kill him. During the course of the attack, Officer M.F. was kicked, punched, pushed, grabbed, and hit with objects by the crowd. Eventually, members of the mob surrounded Officer M.F. to protect him from his attackers and then escorted him back to the police line.

13. When the defendant wrapped his arm around Officer M.F. and pulled the officer into the crowd, the defendant knew that the officer was engaged in the performance of official duties as an officer from the Metropolitan Police Department who was assisting the United States

Capitol Police.

14. As a result of the attack, Officer M.F. sustained significant and painful injuries. As Daniel Rodriguez repeatedly applied a taser to the back of Officer M.F.'s neck, Officer M.F. experienced excruciating pain and was rendered momentarily helpless. He can be heard screaming on his body-worn camera. The tasing caused burn marks to the back of Officer M.F.'s neck that resulted in scarring. Shortly after being tased, Officer M.F.'s body-worn camera shows the efforts of those around him trying to elicit a response from him, indicating that he lost consciousness for more than two minutes.

15. Officer M.F. was then transported to the Emergency Room, where [REDACTED]

[REDACTED paragraph]

16. [REDACTED]

[REDACTED]

17. [REDACTED]



18.     The defendant does not have first-hand knowledge of the actions of Kyle Young, Thomas Sibick, or Daniel Rodriguez in Washington, D.C. on January 6, 2021, and therefore could not truthfully testify about their activities on that day.

Respectfully submitted,

MATTHEW M. GRAVES
Acting United States Attorney
D.C. Bar No. 481052

By:     /s/
KIMBERLY PASCHALL
CARA GARDNER
Assistant United States Attorney

## DEFENDANT'S ACKNOWLEDGMENT

I, Albuquerque Head, have read this Statement of the Offense and have discussed it with my attorney. I fully understand this Statement of the Offense. I agree and acknowledge by my signature that this Statement of the Offense is true and accurate. I do this voluntarily and of my own free will. No threats have been made to me nor am I under the influence of anything that could impede my ability to understand this Statement of the Offense fully.

Date: 4-26-22

_Albuquerque Head_
Albuquerque Head
Defendant

## ATTORNEY'S ACKNOWLEDGMENT

I have read this Statement of the Offense and have reviewed it with my client fully. I concur in my client's desire to adopt this Statement of the Offense as true and accurate.

Date: 4/26/22

_Nick Wallace_
Nick Wallace
Attorney for Defendant