**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **No.  1:21-CR-291-002** |
| | ) | |
| **ALBUQUERQUE COSPER HEAD** | ) | |

**ALBUQUERQUE HEAD'S SENTENCING MEMORANDUM AND**
**MOTION FOR DOWNWARD VARIANCE**

Defendant Albuquerque Head, through his undersigned counsel, files this

Sentencing Memorandum requesting this Honorable Court to determine a sentence that is

sufficient but not greater than necessary to achieve the purposes of sentencing as set forth

in 18 U.S.C. § 3553(a).

The Presentence Investigation Report (hereinafter "PSR") filed in this case

calculates the total offense level as 24 and a criminal history category of VI. This would

typically equate to an advisory guidelines range of 100-125 months. However, because

Mr. Head pleaded guilty to 18 U.S.C. § 111(a)(1), the statutory maximum sentence is 96

months. Therefore, the effective guideline range, as calculated by the PSR, is 96 months.

Mr. Head respectfully requests this Honorable Court to vary from the advisory

guideline range and impose a sentence of 60 months, which is sufficient but not greater

than necessary in light of the factors set out in 18 U.S.C. § 3553(a).

In support thereof, Mr. Head provides the following:

I.      **Procedural History**

On April 9, 2021, Albuquerque Head, along with two other co-defendants, were

charged in a thirteen-count indictment that alleged a myriad of offenses stemming from

their conduct on January 6, 2021, at the U.S. Capitol. (Doc. 19). Mr. Head was arrested

on April 14, 2021, and made his initial appearance in the Eastern District of Tennessee on April 15, 2021. He was ordered detained and committed to this district for further prosecution. (Doc. 36). He has remained in continuous federal custody since this date.

On May 6, 2021, Mr. Head made his initial appearance in this district and was formally arraigned on the pending charges. On December 1, 2021, a superseding indictment was returned against Mr. Head and the other two co-defendants. (Doc. 100). The substantive counts remained unchanged as to Mr. Head, but certain wording and statutory language was changed throughout the indictment.

On May 6, 2022, pursuant to a written plea agreement, Mr. Head pleaded guilty to Count 4 of the Superseding Indictment, which charged him with Assault of a Law Enforcement Officer, in violation of 18 U.S.C. § 111(a)(1). (Doc. 123). The Government agreed to dismiss all of the remaining counts against Mr. Head in exchange for his guilty plea.

## II.    History and Characteristics of Mr. Head and the Nature and Circumstances of the offense.

"Each of us is more than the worst thing we have ever done," writes famed lawyer and death-row activist Brian Stevenson[1]. January 6, 2021, was a dark day in American History. On that day, thousands of individuals descended on Washington D.C. to attend then President Donald Trump's rally. During the rally, the former president took the stage and encouraged those present to "walk down Pennsylvania Avenue" and "demand Congress to do the right thing," referring to the already in-progress counting of the electoral votes by lawmakers at the U.S. Capitol[2]. What followed was some of the darkest

---

[1] STEVENSON, BRYAN, *JUST MERCY:* A STORY OF JUSTICE AND REDEMPTION 17 (Spiegel & Grau eds., 2014).

[2] https://www.washingtonpost.com/politics/2021/02/10/when-did-jan-6-rally-become-march-capitol/

hours in our history. After former President Trump worked the crowd into a frenzy, many of the individuals at the rally marched to the U.S. Capitol and engaged in destruction and violence as members of Congress attempted to carry out their functions within the building. Albuquerque Head was present on January 6, 2021, and was a participant in the violence. Like the United States of America on January 6, he too is better than the worst thing he has ever done.

### A.  Albuquerque's Story

Albuquerque Head appears before this Honorable Court as a 43-year-old seeking redemption and mercy. Born in Cleveland, Ohio, Mr. Head relocated to upper eastern Tennessee when he was a teenager and has resided there ever since. Both of his parents worked outside the home to support the family. Mr. Head recalls that he always had everything he needed when he was growing up but there was not any excess. Mr. Head, along with his brother and sister, attended school and helped out the family by working as they were able.

Mr. Head's mother still lives in eastern Tennessee and is very close to Mr. Head. She is in declining health, however. After Mr. Head's arrest, his mother was able to watch his minor children during the day. However, because of her health, she is no longer able to do so. Albuquerque was also close with his father. The two butted heads over the years but Albuquerque admired his father and his hard-working, no-nonsense way of living life. Prior to his arrest in the instant case, his father was sick and continued to deteriorate. His father passed away in October 2021, just a few months after Albuquerque was arrested. His quote in the PSR about his father's passing speaks for itself: "[h]e has

always been there for me, and I wasn't there for him when he needed me." PSR, at pg. 39.

Albuquerque began to experience with controlled substances at an early age. What started as recreational marijuana use began to escalate to weekend use of cocaine and morphine. In his early twenties, he was introduced to opiates and methamphetamine. His use of opiates became daily and a full-blown addiction blossomed.

Not surprisingly, as Mr. Head's addiction continued to worsen, so did his criminal behavior. The PSR chronicles a lengthy criminal history that is quintessential of an addict – multiple convictions for petty offenses, simple possession, and a bevy of driving offenses. Each offense was met with a term of custody in the county jail followed by probation. No meaningful treatment was ever offered but instead Mr. Head was expected to comply with all of the rules and conditions of probation while in the throws of his addiction. This was an impossible task and one that resulted in numerous violations and more county jail time. This unfortunate – but all too common problem – continued until 2017.

About six years ago, Mr. Head met his current girlfriend (and mother of his children), Amanda Rock. When the two met, Mr. Head was recently sober and was back to working full-time. Ms. Rock has a 10-year-old daughter from a previous relationship that Mr. Head stepped in to help raise almost immediately. In her letter to the Court, she writes:

> "[h]e is a good, caring, and loving man. He took in my oldest child like she was his from day one. He went to work every day has [sic] always made sure we have everything we needed…"

They were blessed with their first daughter together in 2019 and their second daughter in September of 2020; just a few months before Mr. Head's arrest.



*Figure 1: Mr. Head reading to his child.*



*Figure 2: Mr. Head being silly with his child.*

At the time of the birth of their second child, Mr. Head was working and was the sole-provider for the family. The family was set to purchase their own home in April 2021 when he was taken into custody. As a result of the arrest, Ms. Rock has been forced

to go back to work and find full-time childcare for the two younger children. As
imagined, it has not been easy:

> "…but at the end of the day its not the men who are
> going to suffer through all of this. Luckily the girls
> have been able to talk to him most days and get video
> visits…I will do whatever I have to [sic] make sure
> these girls are taken care of and make them best
> understand why daddy is not here, but these children
> are the ones who are suffering."

The full letter from Ms. Rock, as well as others in support of Mr. Head, are collectively
attached to this Memorandum as Exhibit A.

When Albuquerque made up his mind that he wanted to remain sober a few years
ago, he leaned on his family, his more and more serious relationship with Ms. Rock, and
his job. As evidenced in the PSR, his criminal history also came to a screeching halt – not
acquiring any new arrests or charges since 2015. His state probation officer further
confirmed that at the time of his arrest for this case, Mr. Head was in total compliance
with his probation, to include negative drug screens and reporting as directed. PSR, at pg.
35. The pending state violation is directly related to the instant case before the Court. His
state probation was set to expire April 30, 2021; just 15 days from the date of his arrest.

Mr. Head boasts considerable experience in the construction industry. He's
touched all of the facets of construction – drywall, roofing, and finishing. Prior to his
arrest, he was employed full-time at the same company since April 2018. The same
company is willing to hire him back upon his release[3].

---

[3] This employment letter is included in Exhibit A. Certain information is redacted out of privacy concerns.
Unredacted copies were provided to the Court and Government counsel.



*Figure 3 Mr. Head (right) at work.*

Even during his time in custody, Mr. Head has opted to work. He has spent the majority of his pre-trial detention at the Northern Neck Regional Jail (hereinafter "NNRJ), located in Warsaw, Virginia. Almost immediately upon his arrival, he was given a trustee position. He is a floor trustee and is responsible for general cleaning and laundry. He handles cleaning chemicals, paint, and food trays. He works seven days a week for $6 a week. During his time at NNRJ, he has not received a single disciplinary infraction.  Mr. Head is committed to trying to pick back up where he left off when he is released. He wants to raise his girls, support Ms. Rock, and remain clean and sober. He continues to try and be better than his worst that was displayed on January 6th.

### B.  Albuquerque's Involvement on January 6th

Albuquerque made a series of bad decisions on January 6th, including deciding to go in the spur-of-a-moment decision. There was no planning or coordination nor is Mr. Head affiliated with any group that did so. Mr. Head drove through the night of January 5th and arrived early in the morning on January 6th. He rested for a couple of hours before attending then President Trump's rally. After Trump mentioned going to the Capitol, Mr.

Head followed the rest of the rally attendees there. This was another bad decision that Mr. Head readily admits.

Once at the Capitol, he climbed his way up near the lower west terrace. It was there where he encountered a member of the press who was asking for someone to help her get closer. Mr. Head, noticing that she was of small stature, obliged. He helped her all the way into the tunnel on the lower west terrace and lifted her up on a flat surface so she could continue filming the chaos. Contemporaneously, rioters rushed into the tunnel and met the well-formed police line. Mr. Head joined the cause and made his way to the front of the line, another bad decision. He pushed against the police line and a grabbed a riot shield to aid in his attempt. More bad decisions that were escalating. A few minutes later, Mr. Head admits to wrapping his arm around Officer Fanone and pulling him outside of the tunnel. As the duo advanced, they were surrounded by hundreds of others that were pushing and shoving in every which way. Mr. Head knew that this was a precarious position that he had found himself in and even more so for Officer Fanone, who the crowd had turned against.

At this point, Mr. Head told Officer Fanone "I'm going to get you out of here." To which Officer Fanone replied, "thank you." As the duo exited the tunnel on the lower west terrace, Mr. Head exclaimed "I've got one." This is a comment he regrets given its context, but he remains steadfast that it was not meant to be a sacrificial offer of Officer Fanone to the crowd. The two continued to push and shove one another for approximately 35 seconds before Officer Fanone broke away; the final chapter of bad decisions that Mr. Head made that day.

Albuquerque is embarrassed and remorseful. He understands there are consequences for his series of bad decisions and he has come to peace with that. He further understands just how serious his actions were that day and the harm that resulted. Although he is responsible for the initial assault of Officer Fanone, Mr. Head <u>did not</u> participate in what transpired outside of the tunnel. He <u>did not</u> punch, kick, rob, taze, or further taunt Officer Fanone after they were separated.



*Figure 4: The larger circle is Officer Fanone fighting with Kyle Young while the smaller circle is Mr. Head.*



*Figure 5: Mr. Head (bottom, right circle) fades further away from Officer Fanone's assault.*

Mr. Head's entire involvement lasted less than 5 minutes. These few minutes now stand
to cost Mr. Head nearly everything. He has accepted responsibility and entered an
expeditious plea to resolve the matter. He chose not to engage in lengthy pretrial motions
nor hold the Government to its burden at trial. Despite what he stands to lose as a result
of his series of bad decisions, he is still better than how he acted in those few minutes.

### C.  Mr. Head did not restrain Officer Fanone.

Paragraph 45 of the PSR applies a 2-level enhancement for restraint of a victim,
pursuant to U.S.S.G. § 3A1.3. The enhancement is applied in error. Section 3A1.3 of the
U.S.S.G. allow for a 2-level enhancement to the offense level "[i]f a victim was physically
restrained in the course of the offense. The phrase "physically restrained" is further defined
in the Commentary to U.S.S.G. § 1B1.1, which defines the phrase as "forcible restraint of
the victim such as being *tied, bound, or locked up*." (emphasis added). Courts have later
held that this is not an exhaustive list for application of the enhancement but does provide

some examples of the conduct where the enhancement is appropriate. *See United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000); *United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020).

While the three examples provided in the Commentary are not exhaustive, they are instructive as to the level of restraint that is to receive the enhancement[4]. Mr. Head does not deny that he made physical contact with Office Fanone, hence his guilty plea to Assault. He does, however, dispute that his physical contact was restraining to a level that requires a higher guideline range.

Mr. Head's contact with Officer Fanone was brief. Consider *United States v. Mikalajunas*, 936 F.2d 153, 156 (4th Cir. 1991). In *Mikalajunas*, the defendant briefly held the victim during a fatal stabbing. The Fourth Circuit held that the non-inclusive definitions in the commentary "imply that the guidelines intend an enhancement for something other than a brief holding…" *Id. See also United States v. Khleang*, 3F.App'x 672, 675 (10th Cir. 2001) (holding that "the nature and duration of the restraint" should be reviewed when determining whether the enhancement is proper); *United States v. Parker*, 241 F.3d 1114, 1118 (9th Cir. 2001) (discussing that "briefly" pointing a gun during robbery is not physical restraint); *United States v. Bell*, 947 F.3d 49, 59 (3d Cir. 2020) (more that momentary restraint is required from list of definitions in Commentary).

Based on the factual basis, Mr. Head became entangled with Officer Fanone at 3:18:52 p.m., where Mr. Head put his arm around Officer Fanone. Within 10 seconds, Officer Fanone was pushing back to break the hold.

---

[4] The lack of prior cases that discern the restraint enhancement within the D.C. Circuit is striking. Because prior examples are lacking, a multitude of cases are pulled from other circuits in hopes that they provide a helpful landscape to the Court.



*Figure 6: Officer Fanone's hand braced against Mr. Head.*

Mr. Head and Officer Fanone continued to struggle for approximately 25 more seconds at which time Officer Fanone pushed Mr. Head back.



*Figure 7: Officer Fanone pushing back against Mr. Head.*

A total interaction that lasted 35 seconds. Furthermore, this was not a scenario where Mr. Head and Officer Fanone were the only two subjects present. There were thousands of people standing around that were tightly compacted. As the thrust of the throng moved, so

did others surrounding them; whether intentionally or unintentionally. Mr. Head was not the sole cause of Officer Fanone moving through the crowd. As others saw what was going on, they pushed the crowd which, in turn, pushed others around them, including Mr. Head and Officer Fanone.

Officer Fanone was never confined by Mr. Head. If one is "tied, bound, or locked up," they are physically confined to a certain place. Any movement is small and labored. "[A] perpetrator's act of enclosing or confining the victim in a space or with a barrier…that constitutes the action meriting enhancement of the offense level." *United States v. Copenhaver*, 185 F.3d 178, 183 (3d Cir. 1999).

Recently, this Court addressed the very same enhancement as it applied to co-defendant Kyle Young.[5] In Mr. Young's case, he was one of the members of the mob that attacked Officer Fanone at the bottom of the lower west terrace. During the attack, Mr. Young held Officer Fanone's left wrist back while other members assaulted and tazed him. Young's contact with Officer Fanone's wrist also allowed other rioters to grab at Officer's Fanone firearm and eventually rob him of his police radio and badge.  At that point, Officer Fanone was at the mercy of the crowd.

During the complete 35 seconds of interaction between Mr. Head and Officer Fanone, they were both moving the entire time. At multiple points Officer Fanone was able to push back. Simply put, a victim that is "tied, bound, or locked up" is devoid of movement and unable to push back. Officer Fanone was never confined to a specific space nor was he forced to remain in a certain area. *See Drew*, 200 F.3d at 880 (observing that to meet the definition in the Commentary, one must restrain "through bodily contact or confine the

---

[5] *U.S. v. Kyle Young*, 2:21-cr-291-003.

victim in some way"). Mr. Head does not dispute that there was bodily contact with Officer Fanone, but it was not continuous nor overtly restraining.

Lastly, Commentary note 2 of §3A1.3 provides that the enhancement should *not* be applied "where the offense guideline specifically incorporates this factor, or where the unlawful restraint of a victim is an element of the offense itself (e.g. this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint)). This exception was addressed in *Mikalajunas*, 936 F.2d at 156 (4th Cir. 1991). In *Mikalajunas*, the Fourth Circuit opined that "every murder involves the ultimate restraint." *Id*. Although not a specific element, the court determined that based on the definition in §1B1.1, something more than a "brief holding" is required. A similar parallel can be drawn for 18 U.S.C. § 111(a)(1) in the instant case. While restraint is not a listed element, any assault encompasses a brief restraint. Applying the enhancement in § 3A1.3 in this case runs afoul of its very commentary.

### III.    The need for the sentence imposed to reflect the seriousness of the offense, promote respect for the law, and to provide just punishment.

A sentence of 60 months, along with a term of supervised release, properly encompasses the factors set out in 18 U.S.C. § 3553(a)(2)(A). The seriousness of Mr. Head's conduct on January 6, 2021 is significant and deserves just punishment. On a larger scale, the threat to our democracy and rule of law on January 6 was striking.

Albuquerque Head faces a term of imprisonment that will be longer than any other sentence he has served. Such a sentence endorses the seriousness of the offense and further promotes respect for the law. His conduct, however, differs from some of those that have been (or will be) before this Court. Take for instance Kyle Young, sentenced to 86 months by this Court on September 27. In that case it was found that Mr. Young

travelled to Washington D.C. with his minor son to attend the rally. Once there, he used a metal pole, a speaker, and a strobe light against law enforcement. Furthermore, he passed a taser to another participant, which would later be used on Officer Fanone.

Consider also, co-defendant Thomas Sibick[6]. Although Sibick has not yet been convicted, his conduct is outlined in pleadings and discovery. Sibick participated in the assault of Officer Fanone and stole his badge and radio during the melee.

Mr. Head has accepted responsibility for his actions and his assault of Officer Fanone. There is no evidence that Mr. Head made advance plans with much effort or that he came to D.C. prepared for a battle. His series of bad decisions, as outlined above, while serious, is far from the worst conduct that day. A sentence of 60 months is significant and adequately address 18 U.S.C. § 3553(a)(2)(A).

## IV.   <u>The need for the sentence imposed afford adequate deterrence to criminal conduct and protect the public from future crimes of Mr. Head.</u>

Title 18 U.S.C. § 3553(a)(2)(B) instructs the sentencing court to consider deterrence as a factor in determining a sentence that is "reasonable" for a particular offender. Title 18 U.S.C. § 3553(a)(2)(C) further instructs the sentencing court to consider the need to protect the public from any future crimes of Mr. Head. Deterrence generally has two components: general and specific.

### A.  General Deterrence

General deterrence focuses on the need to deter other members of the general public from similar offenses. A sentence of 60 months – 5 calendar years – sends a strong message of retribution to the general public. Following any term of imprisonment, Mr. Head will then be

---

[6] *U.S. v. Thomas Sibick*, 1:21-cr-291-001.

subjected to a mandatory term of supervised release. While on supervised release, he will have to follow strict conditions or face additional time in custody.

In addition to the judgement ordered, all individuals convicted as result of their conduct on January 6 face continued scrutiny and collateral effects. The media coverage of January 6 is unparalleled. A simple Google search for Mr. Head now brings up hundreds of articles that detail his conduct on January 6. Mr. Head's case is in even more of a spotlight because of how outspoken Officer Fanone has been since his attack and Mr. Head's link to him. This continued coverage can only have a deterrent effect on others that may be considering the same conduct. Not only does it affect Mr. Head, but also his family and those associated with them.

### B. Specific Deterrence

Specific deterrence focuses on deterring Mr. Head from future crimes. The PSR outlines a lengthy criminal history for Mr. Head. It is something he is not proud of. At first glance it may appear that Mr. Head needs a longer term of imprisonment because that is the only thing that will prevent further harm. A closer look, however, reveals some unusual patterns that suggest Mr. Head is amenable to a shorter term of incarceration plus a term of supervision. Until 2015, Mr. Head's history is replete with petty offenses and violations of probation. This is a classic example of active addiction and its reach. Once Mr. Head made the decision to remain drug-free, his criminal history waned to nearly non-existent. For the first time since he turned 18, he was in total compliance with probation and was able to be supervised.

He now asks the Court to sentence him to 60 months which strips him of everything he has built since 2015. It would also be the longest term of imprisonment by a wide margin. Mr. Head needs no other deterrent to dissuade him from criminal conduct. Contrary to the approach taken by the Sentencing Commission in creating the Sentencing Guidelines,

increasing the length of a sentence does not increase the deterrent effects of punishment. Current empirical research on general deterrence shows that while certainty of punishment has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects."  *See* Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research at 28-29 (2006).  The Commission itself has said that "[t]here is no correlation between recidivism and guidelines' offense level."  U.S. Sentencing Commission, *Measuring Recidivism: the Criminal History Computation of the Federal Sentencing Guidelines*, p. 15 (2004).

A sentence of 60 months, followed by a term of supervised release, properly accounts for both general and specific deterrence as set out in 18 U.S.C. §§ 3553(a)(2)(B) & (C).

### V.    <u>The need for the sentence imposed to provide Mr. Head with the needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.</u>

Although an important factor in many cases, 18 U.S.C. § 3553(a)(2)(D) is not a significant factor for Mr. Head. Mr. Head has obtained his GED and has considerable work experience in the construction industry. It would benefit Mr. Head to learn a skill or trade to make him even more of a marketable potential employee. The BOP is equipped to properly address any further education that would be appropriate for Mr. Head.

It is also important for Mr. Head to continue to focus on his history of addiction and substance abuse. Although he has been clean and sober for more than seven years, his level of addiction can raise its ugly head at any time. Additional counseling and treatment would behoove Mr. Head to curb any attempt of relapse.

Counsel for Mr. Head is unaware of any unusual medical care needs that Mr. Head might require and submits that the BOP is also properly equipped to provide the requisite medical care to Mr. Head during his term of imprisonment.

## VI.   The kinds of sentences available, the applicable category of offense committed by Mr. Head as set forth in the Guidelines, and the need to avoid unwarranted sentencing disparities among similarly situated defendants.

As previously mentioned, Mr. Head contends that the guideline range calculated in the PSR is incorrect. Based on the reasons already submitted herein, Mr. Head further asserts that the guideline range should be calculated as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2A2.2(a)): | 14 |
| Serious Bodily Injury (§3A1.2(b)): | +5 |
| Official Victim (§3A1.2(b)): | +6 |
| Acceptance of Responsibility (§3E1.1(a), (b)): | -3 |
| | ---------- |
| | 22 |

At criminal history category VI, this results in an advisory guideline range of 84-105 months. Because the statutory maximum sentence for an offense covered by 18 U.S.C. s 111(a)(1) is 8 years, the effective guideline range is 84-96 months. Mr. Head has proposed a sentence of 60 months; 24 months below the bottom of the guideline range.

It is noteworthy that an additional 11 levels are added for victim related characteristics. Both the significance of Officer Fanone's injuries and his status of a law enforcement officer are already contemplated. Any additional punishment for these reasons is therefore unnecessary. Mr. Head understands that his conduct and assault of Officer Fanone was a proximate cause to the eventual injuries, but he was not responsible for the actual harm. In *Rita v. United States*, 551 U.S. 338 (2007), the Supreme Court clarified that all sentencing proceedings should begin by correctly calculating the guidelines range. However, the court must then make "an individualized assessment" when determining the

appropriate sentence for a particular offender. *See Gall v. United States*, 552 U.S. 38, 51 (2007).

A sentence at or near the statutory maximum of 96 months also runs the risk of the overrepresenting the seriousness of Mr. Head's criminal history. This is a factor that was even contemplated by the U.S. Probation Office in the PSR. *See* PSR, pg. 47-48[7]. Mr. Head submits that his criminal history score is substantially overrepresented based on the number of petty and driving offenses that were scored. Mr. Head only has one prior felony conviction. PSR, pg. 32. Even this felony offense was a non-violent property crime and received one criminal history point. Every other criminal history point comes from a misdemeanor offense with an offense date of at least 7 years ago. Eleven of those remaining points stem from driving offenses or DUIs. *See*, PSR at ¶¶ 74, 76, 78, 79, 87, and 88. The remaining points are related to theft, possession of drug paraphernalia, and public intoxication.

Using the rubric suggested by the U.S. Sentencing Commission to configure one's criminal history would suggest that Mr. Head is among the worst of offenders with no hope of rehabilitation. The contrary is true, however, and the proof is outlined over the last seven years. Had Mr. Head continued down the path he was on, he certainly would have amassed even more of a criminal history. His monumental life changes turned that trend around.

When Congress tasked the U.S. Sentencing Commission to promulgate the sentencing guidelines, they were intentional in their request that only defendants with a felony crime of violence or a felony drug offense should receive at or near the statutory

---

[7] The Plea Agreement also anticipated a criminal history category V, not VI. *See* Plea Agreement (Doc. 123), at pg. 5. There were 10 criminal history points that were unaccounted for by the parties during plea negotiations. At criminal history category V, the resulting guideline range would have been 77-96 months based on a total offense level of 22.

maximum. *See* 28 U.S.C. § 994(h). Those defendants with two or more crimes of violence or felony drug offenses (i.e., career offenders) should be sentenced to the statutory maximum. *Id*. at § 994(h)(2). Mr. Head is neither a career offender nor does he have a crime of violence or a felony drug offense. Yet he finds himself at the statutory maximum based on the guidelines. His reduction for acceptance of responsibility has a limited impact on his overall range because of the overrepresentation of his criminal history. A variance is appropriate to encourage and promote the benefit afforded to individuals who fully accept responsibility. A sentence of 60 months appropriately considers the factors set out in 18 U.S.C. § 3553(a)(3), (4), and (6).

## VII.   <u>The need to provide restitution to any victims of the offense.</u>

Pursuant to the written plea agreement, Mr. Head is to pay $2,000 in restitution. *See* Plea Agreement (Doc. 123), Pg. 9-10. Mr. Head submits that this is a reasonable amount of restitution in light of his conduct and as agreed upon by the parties.

Also, pursuant to the PSR, Officer Fanone has been contacted about restitution and he is not seeking any. PSR, pg. 8. Mr. Head specifically objects to any requests by the Government to defer a final order of restitution to better account for any other losses that may be subject to a claim.

## VIII.   <u>Conclusion</u>

In consideration of the foregoing, Albuquerque Head respectfully submits that a sentence of 60 months, followed by 3 years of supervised release, is sufficient but not greater than necessary to achieve the sentencing purposes set forth in 18 U.S.C. § 3553(a).

RESPECTFULLY SUBMITTED:

FEDERAL DEFENDER SERVICES OF

EASTERN TENNESSEE, INC.

BY:     s/ *G. Nicholas Wallace*
              G. Nicholas Wallace
              ASB No. 6992D56F
              FEDERAL DEFENDER SERVICES
              OF EASTERN TENNESSEE, INC.
              800 South Gay Street, Suite 2400
              Knoxville, TN  337929
              (865) 637-7979

## CERTIFICATE OF SERVICE

I hereby certify that on October 17, 2022, a copy of the foregoing Defendant's Sentencing Memorandum was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's electronic filing system.

              s/ *G. Nicholas Wallace*