**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-CR-291-2-ABJ** |
| **ALBUQUERQUE COSPER HEAD,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in the above-captioned matter. Defendant Albuquerque Head ("Head" or "defendant Head") is guilty of one of the most serious crimes committed at the U.S. Capitol on January 6, 2021—dragging Metropolitan Police Department Officer Michael Fanone out of the Lower West Terrace Tunnel into a mob of violent rioters where he was viciously assaulted. For the reasons set forth herein, the government requests that this Court sentence Head to a term of incarceration of 96 months—which is the statutory maximum for his offense but below the bottom of the unadjusted Sentencing Guidelines range for Head's offense of 100-125 months, as calculated by probation—three years of supervised release, at least $2,000 in restitution,[1] and the mandatory $100 special assessment. Although that sentence would exceed by one year the sentence this Court imposed on Head's codefendant, Kyle Young, the longer sentence for Head is justified by his initiation the assault on Officer Fanone and by his substantial criminal history, resulting in probation's calculation of Head's criminal history

---

[1] As noted below, the Court should defer a restitution determination for up to 90 days.

as Category VI.

## I.    INTRODUCTION

The defendant, Albuquerque Head, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced the interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.7 million dollars' in losses.[2]

Head, a construction laborer with a lengthy criminal history that includes approximately 45 prior arrests, joined the storming of the police line in the tunnel on the Lower West Terrace ("LWT"). He purposely moved to the front lines of a violent confrontation between rioters and the dramatically out-numbered Washington, D.C. Metropolitan Police Department ("MPD") officers. Head falsely claimed in a custodial interview conducted after he was arrested that he was merely trapped in the tunnel by the crush of the crowd; this claim is flatly contradicted by video evidence depicting his willful and persistent participation in some of the most barbaric violence on January 6.

After moving to the front lines of the confrontation with police officers, Head repeatedly struck towards the police line with a riot shield. Undeterred when he lost control of the shield he was wielding as a weapon, he beckoned for other rioters to send him another shield. He used the newly acquired shield to press his weight against police officers on the front line in an effort to

---

[2] As of April 5, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,734,783.15.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

forcibly push them back. The officer taking the brunt of Head's efforts was MPD Officer Michael Fanone, who had just moved to the front of the line to relieve his embattled colleagues. When Officer Fanone used his hand to brace himself on the doorframe in the midst of the struggle, Head struck the officer's hand with his own hand, causing the officer to lose his grip on the doorframe.

In the moments that followed, Officer Fanone and his fellow officers pushed back the violent mob, including Head, regaining ground in the tunnel. As Head was pushed out, he did not retreat. Rather, he wrapped his arm around Officer Fanone's neck and emitted a sickening yell to his fellow rioters—"I've got one!" Head forcibly dragged Officer Fanone into the riotous mob, isolating him as the crowd violently assaulted the officer. Head continued to restrain Officer Fanone while another rioter applied a taser to the base of the officer's skull. Head only let go when Officer Fanone reacted with enough force to free himself from Head's grip. Although Head was separated from Officer Fanone in the moments that followed, Head would have been able to hear the sound of the taser being activated again, Officer Fanone's screams of agony, and the yells from another rioter to "Kill him with his own gun!" Head forced his way back through the crowd as a group of rioters began to surround the officer to protect him from his attackers. Undeterred, Head reached toward Officer Fanone repeatedly, grabbing onto the officer and trying to regain control until one of Fanone's protectors forcibly pushed Head away.

As explained below, this Court should impose a substantial prison sentence in this case that takes into account the extent of Head's violent criminal conduct on January 6. The Government recommends that the Court sentence Head to 96 months incarceration. Such a sentence reflects the gravity of Head's conduct, as well as his protracted criminal history.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

On January 6, 2021, hundreds of rioters unlawfully broke into the U.S. Capitol Building in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election. Many rioters attacked and injured police officers, sometimes with dangerous weapons; they terrified congressional staff and others on scene that day, many of whom fled for their safety; and they ransacked this historic building—vandalizing, damaging, and stealing artwork, furniture, and other property. This occurred as Congress was certifying the Electoral College vote for the 2020 presidential election.

> ### Attempted Breach of the Capitol Building and Assaultive Conduct in Tunnel Leading to the doors of the West Front of the U.S. Capitol Building

> The fighting in the lower West Terrace tunnel was nothing short of brutal. Here, I observed approximately 30 police officers standing shoulder to shoulder, maybe four or five abreast, using the weight of their bodies to hold back the onslaught of violent attackers. Many of these officers were injured, bleeding, and fatigued, but they continued to hold the line.

Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

One of the most violent confrontations on January 6 occurred near an entrance to the Capitol Building in the LWT. As explained *infra*, Head was in the thick of that violence, working his way to the front of the mob to personally and forcefully contribute to it.

The entrance usually consists of a flight of stairs leading to a doorway. On January 6, 2021, however, the construction of the inaugural stage converted the stairway into a 10-foot-wide, slightly sloped, short tunnel that was approximately 15 feet long. That tunnel led to two sets of metal swinging doors inset with glass. On the other side of the two sets of swinging doors is a

security screening area with metal detectors and an x-ray scanner and belt, that leads into the basement of the Capitol Building. The exterior of the tunnel is framed by a stone archway that is a visual focal point at the center of the West Front of the Capitol Building. This archway is also of great symbolic significance as it has been the backdrop for nine presidential inaugurations, is draped in bunting during the event, and is the entrance for the President-Elect and other dignitaries on Inauguration Day.  Exhibit 1; "Inauguration at the U.S. Capitol", Architect of the Capitol, https://www.aoc.gov/what-we-do/programs-ceremonies/inauguration.



**Exhibit 1**

On January 6, 2021, when rioters arrived at the doors behind this archway, the outer set of doors was closed and locked, and members of Congress who had fled from the rioters were sheltering nearby. Members of the U.S. Capitol Police ("USCP"), assisted by officers from the MPD,  were

arrayed inside the doorway and guarding the entrance. Many of these officers had already physically engaged with the mob for over an hour, having reestablished a defense line here after retreating from an earlier protracted skirmish on the West Plaza below.

At approximately 2:42 p.m., the mob broke the windows to the first set of doors, and the police officers reacted immediately by spraying Oleoresin Capsicum ("OC") spray at the rioters, who continued to resist. The mob continued to grow, and the rioters pushed their way into the second set of doors, physically engaging police with batons, poles, chemical spray, bottles, and other items. Officers created a line in the doorway to block the rioters and physically engaged them with batons and OC spray.

At a Congressional hearing on July 27, 2021 regarding the assault on the Capitol on January 6, Congresswoman Stephanie Murphy described her experience nearby this location in response to testimony from MPD Officer Daniel Hodges, who was assaulted while caught in the tunnel doors between the two forces:

> January 6th was an attack on our democracy, it was an attack on the peaceful transfer of power, and it was an attack on this Capitol building, but it was also an attack on real people. And most people don't know this -- and I don't think even you know this -- but your actions had a profound impact on me. So, at 3:00 p.m. on January 6th, 2021, while you were holding back the mob at the Lower West Terrace entrance, I was holed up with Congresswoman Kathleen Rice in a small office about 40 paces from the tunnel that you all were in. That's about from the distance where I'm sitting here on the dais to that back wall. And from that office in close proximity to where you all held the line, I listened to you struggle. I listened to you yelling out to one another. I listened to you care for one another, directing people back to the makeshift eyewash station that was at the end of our hall. And then, I listened to people coughing, having difficulty breathing, but I watched you and heard you all get back into the fight.

> ****

> Imagine if they had caught the two members of Congress that were just 40 feet from where you all were…. Well, I'm telling you that you were our last line of defense

and during the exact period of time Officer Hodges, in that video where you were sacrificing your body to hold that door, it gave Congresswoman Rice and I, and the Capitol police officers who had been sent to extract us the freedom of movement on that hallway to escape down the other end of that hallway. And I shudder to think about what would have happened had you not held that line. I have two young children, I have a 10-year-old son and a 7-year-old daughter, and they're the light of my life. And the reason I was able to hug them again was because of the courage that you and your fellow officers showed that day. And so, just a really heartfelt thank you. I think it's important for everybody though, to remember that the main reason rioters didn't harm any members of Congress was because they didn't encounter any members of Congress, and they didn't encounter any members of Congress because law enforcement officers did your jobs that day and you did it well.

Hearing Before the House Select Comm. to Investigate the January 6th Attack on the United States Capitol, 117 Cong. (July 27, 2021) (Statement of Rep. Stephanie Murphy) available at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack.

The violent and physical battle for control over the LWT entrance in the tunnel and doorway area continued for over two hours, during which time rioters repeatedly assaulted, threatened, pushed, and beat police officers. The battle for the LWT entrance involved intense hand-to-hand combat, and some of the most violent acts against police, including the abduction and tasering of Officer Fanone and the assault of Officer Hodges.

During this battle, the vastly outnumbered officers were assaulted with all manner of objects and weapons, receiving blow after blow from rioters taking turns assaulting them, all in a concerted effort to breach the doorway to the basement area of the Capitol, disrupt the certification, and overturn the election results by force. Capitol Police Sgt. Aquilino Gonell, who was present in the tunnel that day, explained:

> What we were subjected to that day was like something from a medieval battle. We fought hand-to-hand, inch-by-inch to prevent an invasion of the Capitol by a violent mob intent on subverting our democratic process. My fellow officers and I were committed to not letting any rioters breach the Capitol. It was a prolonged and desperate struggle. *Id.* (Statement of Sgt. Aquilino Gonell)

7

Despite the mob's efforts, the officers in the LWT held the line with commendable restraint, and through personal sacrifice and valor. Officer Fanone described one of his colleagues' actions that day:

> In the midst of that intense and chaotic scene, [MPD] Commander [Ramey] Kyle remained cool, calm, and collected as he gave commands to his officers. "Hold the line," he shouted over the roar. Of course, that day, the line was the seat of our American government. Despite the confusion and stress of the situation, observing Ramey's leadership, protecting a place I cared so much about, was the most inspirational moment of my life. The bravery he and others showed that day are the best examples of duty, honor, and service. *Id.* (Statement of Officer Michael Fanone)

Several officers sustained injuries during this prolonged struggle, and many returned to defend the Capitol, even when injured, as substantial reinforcements for these officers did not arrive until heavily armored Virginia State Police officers joined the police line with additional munitions around 5:00 p.m.

Despite being under constant assault, these officers nevertheless provided first aid to injured rioters who were trapped in the tunnel area, including those who had difficulty breathing as a result of chemical irritants that had been used in the tunnel area.  It is no exaggeration to state the actions of these officers in thwarting the mob at the LWT entrance potentially saved the lives of others, including Members of Congress.

### B.    Head's Role in the January 6, 2021 Attack on the Capitol

Albuquerque Head participated in the January 6 attack on the Capitol after traveling from his home in Kingsport, Tennessee. His crimes are documented through a series of videos obtained by law enforcement officials, including videos filmed by private citizens, body-worn camera from MPD Officer Fanone, and USCP surveillance footage from the Capitol.

8

<u>Head Arrived at the LWT Tunnel and Pushed to the Front Line of Rioters Battling Police</u>

An open-source video, Exhibit 2,[3] shows Head on the steps in front of the LWT tunnel before he entered the tunnel, at approximately 3:06 p.m. Head first appears in the bottom left of the screen at minute marker 00:58 in Exhibit 2 wearing a camouflage "Trump 2020" hat, grey face gaiter, and grey t-shirt. He pumped his fist in the air repeatedly at minute marker 1:08-1:15.



**Exhibit 2A** (*minute marker 1:09*)

---

[3] All video exhibits will be provided to the Court and defense counsel. Exhibit 2 is also available at https://www.youtube.com/watch?v=exv329OZA2A.

At minute marker 1:18, Head turned toward the mouth of the tunnel, revealing a knife at his hip.



**Exhibit 2B** (*minute marker 1:18*)

Head then moved through the crowd toward the mouth of the tunnel and disappeared from view

entirely at minute marker 3:06.



**Exhibit 2C** (*minute marker 1:37*)

As Head disappeared from view in Exhibit 2, he became visible in surveillance footage at

the mouth of the tunnel at time stamp 3:07:53 p.m. Head entered the tunnel by 3:08:22. *See*

Exhibit 3.



**Exhibit 3A**



**Exhibit 3B**

Head then pushed toward the line of officers in the tunnel, who are not visible on camera,

turning his back to the police line at one point as he continued to move in that direction before

disappearing from view by time stamp 3:10:04 p.m.



**Exhibit 3C**

Several seconds later, police officers pushed Head and his fellow rioters back from the exterior doors of the building. Head fought to get back to the front line, pausing at 3:10:34 p.m. to accept a gas mask from a fellow rioter.



**Exhibit 3D** (*screenshot brightened for enhanced visibility*)

Head removed his hat to put on the gas mask and then continued to press toward the front line, where rioters were confronting police officers, disappearing from view by 3:10:45 p.m. Head is not visible again on the USCP CCTV until approximately one minute later.



**Exhibit 3E** (*Head wearing a gas mask before disappearing from view; screenshot brightened for enhanced visibility*)

While Head is out of view of the USCP surveillance camera, he is visible in a video taken by another rioter in the tunnel. In a cell phone video taken by defendant Steven Cappuccio, Head can be seen as he pushed against an MPD officer, who had a shield up to protect himself from oncoming rioters. *See* Exhibit 11, time stamp 00:05 to 00:14. After approximately ten seconds, the officer was able to push Head away from the door and back into the tunnel.



**Exhibit 11A** (*Head pushes against shield of MPD Officer*)

13

Head can be seen briefly on surveillance in Exhibit 3, after he is pushed back from the police line, at approximately 3:11:36 p.m. Head lifted his gas mask up to his forehead, before moving out of frame again to the bottom left of the video. *See* Exhibit 3, time stamp 3:11:34-3:11:36. Less than thirty seconds later, at 3:11:58 p.m., the rioters in the tunnel began a heave-ho effort against the police line that lasted approximately twenty seconds until 3:12:18 p.m.



**Exhibit 3F** (*Head pushed back from police line and removed gas mask before heave-ho begins*)

### Head Assaulted the Police Line with a Riot Shield

At 3:13:34 p.m., Head is again visible on USCP surveillance at the front line of rioters who were battling police officers, this time without the gas mask. In the next thirty seconds, Head twice struck towards the police line with a riot shield.

14



**Exhibit 3G** (*screenshot brightened for enhanced visibility*)



**Exhibit 3H** (*screenshot brightened for enhanced visibility*)



**Exhibit 3I** (*screenshot brightened for enhanced visibility*)

15

Head then lost control of the shield. He turned toward the mouth of the tunnel at 3:14:13 p.m. and held up his hand, beckoning for another riot shield. Rioters passed another shield through the crowd to Head, who grabbed it at 3:14:22 p.m.



**Exhibit 3J** (*screenshot brightened for enhanced visibility*)

Head held the shield in front of him, lowered it to let another rioter pass through the crowd, and then pushed forward toward the police line until he is out of the frame by 3:15:15 p.m.



**Exhibit 3K** (*screenshot brightened for enhanced visibility*)

A video taken by photojournalist Jon Farina, Exhibit 4.1,[4] shows Head using the riot shield to strike toward police officers from another angle.



**Exhibit 4.1A** (*minute marker 00:37, screenshot brightened for better visibility*)

This same video also shows Head using the shield to push against police officers, including Officer Fanone, who is on the front of the police line, bearing the weight of the shield that Head was wielding. *See* Exhibit 4.2. Head pushed the shield against Officer Fanone for nearly three minutes before officers successfully forced rioters away from the doors.

---

[4] Exhibits 4.1 and 4.2 are clips from a longer video by photojournalist Jon Farina, which is available at https://www.youtube.com/watch?v=cJOgGsC0G9U&feature=youtu.be.



**Exhibit 4.2A** (*minute marker 00:16*)



**Exhibit 4.2B** (*minute marker 00:40*)

During the struggle, Officer Fanone used his right hand to brace himself against the doorframe as Head pushed down on the Officer with the shield. *See* Exhibit 4.2C below. Head used his left hand to strike Officer Fanone's right hand in an effort to cause the Officer to lose his grip on the doorframe. *See* Exhibit 4.2D below.

18



**Exhibit 4.2C** (*minute marker 00:55*)



**Exhibit 4.2D** (*minute marker 00:57*)

Head continued to press the riot shield against Officer Fanone, at one point turning to tell rioters behind him, "I can't hold. I can't hold no longer."

19



**Exhibit 4.2E** (*minute marker 01:22*)

The rioters behind Head pushed forward rhythmically. Police officers, including Officer Fanone, pushed back, eventually clearing rioters away from the doors and toward the mouth of the tunnel by the three-minute mark in Exhibit 4.2.



**Exhibit 4.2F** (*minute marker 2:47*)

Officer Fanone's body-worn camera shows the struggle with Head at the door from another

angle. *See* Exhibit 5.1. At time stamp 15:14:35,[5] Officer Fanone's body-worn camera shows him

at the back of the line of police officers at the LWT Tunnel. Officer Fanone yelled, "Let's get some

fresh guys up front!" He then moved to the front of the line to give some of his fellow officers a

break from confronting the rioters. At time stamp 15:15:18, Officer Fanone blocked a riot shield

that Head hoisted toward the officers on the front line.



**Exhibit 5.1A**

Officer Fanone continued to bear the weight of the shield as Head pushed against it, pushing back

until he and his fellow officers gain ground by time stamp 15:18:17, when Head's shield is no

longer visible on Officer's Fanone's body-worn camera.

---

[5] The time stamp on the body-worn camera is in military time. The time 15:14:35 equates to 3:14:35 p.m.



**Exhibit 5.1B**

<u>Head Dragged Officer Fanone into the Mob</u>

As police officers pushed rioters toward the mouth of the tunnel, Head and Officer Fanone

continued to struggle. Officers gained ground in the tunnel at 3:18 p.m., and Officer Fanone is

visible on surveillance video pushing Head toward the mouth of the tunnel.



**Exhibit 3K** (*screenshot brightened for better visibility*)

As Head and Officer Fanone moved together toward the mouth of the tunnel, Head wrapped his

arm around Officer Fanone.

22



**Exhibit 3L** (*screenshot brightened for better visibility*)

They faced each other briefly and appeared to be speaking to one another in the mouth of the tunnel. Some of that exchange is audible on Officer Fanone's body-worn camera. At time stamp 15:18:43 in Exhibit 5.2, Head can be heard saying, "I'm going to try to help you out here. You hear me?" Officer Fanone replies, "Thank you." At 15:18:49, Head then yells, "Hey! I got one!"



**Exhibit 3M** (*screenshot brightened for better visibility*)

Head, with his arm wrapped around Officer Fanone's neck, then pulled Fanone into the mob by

23

3:19 p.m., as depicted in the surveillance footage.



**Exhibit 3N**

Officer Fanone's body-worn camera, which is positioned at his chest, only depicts flashes of dark and light, as the camera seems to be pressed against Head's shirt. At time stamp 15:19:00 through 15:19:05, Officer Fanone's arm is visible pushing against Head, as Head restrained him.



**Exhibit 5.2A**

A video filmed by a private citizen depicts what happened after Officer Fanone and Head

disappeared from the vantage point of the USCP surveillance camera. *See* Exhibit 6.1.[6] This video

shows Head dragging Officer Fanone into the mob.



**Exhibit 6.1A** (*minute marker 00:07, screenshot brightened for better visibility*)

In another video filmed by a private citizen, Head is visible from another angle pulling

Officer Fanone into the crowd. *See* Exhibit 7 at minute marker 00:14-00:40.



**Exhibit 7A** (*minute marker 00:24*)

Head restrained Officer Fanone and dragged him deeper into the hostile mob for twenty-five

seconds. Head continued to restrain Officer Fanone as Daniel Rodriguez[7] applied a taser to the

---

[6] This Exhibit has been altered with a highlight box to allow the viewer to more easily identify and follow Officer Fanone and Head in the crowd. An unaltered version of the same video is provided as Exhibit 6.2.

[7] *U.S. v. Daniel Rodriguez*, 1:21-cr-00246-ABJ-1. Rodriguez was indicted for, among other charges, using a taser on the back of MPD Officer Fanone's neck.

back of the officer's neck. Officer Fanone reacted in pain, forcefully pushing off Head and holding his hand to his neck and face.



**Exhibit 6.1B** (*Head continues to restrain Fanone as Rodriguez applies the taser to the Officer's neck; minute marker 00:23, screenshot brightened for better visibility*)

Seconds later, Rodriguez again held the taser to the back of Officer Fanone's neck, and Head's co-defendant Kyle Young lunged toward Officer Fanone. The sound of the taser activation is audible on the video. *See* Exhibit 6.2, minute marker 00:45-1:00. Officer Fanone can be heard screaming in pain on his body-worn camera video at minute markers 15:19:15, 15:19:17, and 15:19:21-22.

At this point, co-defendant Young was restraining Officer Fanone's wrist while members of the crowd yelled, "Kill him!" and "Get his gun!" Officer Fanone felt the rioters grabbing and pulling on his body and uniform the entire time he was in the crowd. Officer Fanone was primarily focused on keeping his gun secure. He stated on body-worn camera, Exhibit 5.3**,** at time stamp 15:37:23-33, "That scared the shit out of me. They were trying to take my gun. I was holding on to my gun . . . for dear life." An independent photojournalist, Mel Cole, witnessed the assault on Officer Fanone and reported that he heard someone yelling "Kill him with his own gun." *See*

Exhibit 7.[8] In an interview with the FBI, co-defendant Thomas Sibick also reported that he witnessed at least two individuals trying to grab Officer Fanone's gun and that he heard someone say to get his gun and kill him. During this time, Sibick robbed Officer Fanone of his police badge and his MPD-issued radio.

Head remained separated from Office Fanone at this point, but he was turned in the direction of the ongoing attack on the Officer.



**Exhibit 6.2A** (*minute marker 00:55, screenshot brightened for better visibility*)

Head was then pressed further away by the crush of the crowd, but he forced his way up the stairs back to where the assault was ending as a group of individuals in the crowd surrounded Officer Fanone to protect him from his attackers. Unwilling to see the assault end, Head repeatedly reached toward Officer Fanone.

---

[8] This interview is also available at https://www.bbc.com/news/av/world-us-canada-55621856.



**Exhibit 6.2B** (*minute marker 1:25, screenshot brightened for better visibility*)

Head eventually succeeded in making contact with the officer's left shoulder, and pulled

Officer Fanone back toward himself, trying to regain control of the officer.



**Exhibit 6.2C** (*minute marker 1:37, screenshot brightened for better visibility*)

Head continued to attemp to hang on to the officer for nearly a minute before a member of the

crowd pushed Head out of the circle of people trying to protect the Officer Fanone.

28



**Exhibit 6.2D** (*minute marker 2:24, screenshot brightened for better visibility*)

Exhibit 7 shows the member of the crowd pushing off Head from a different angle. *See* Exhibit 7 at minute marker 2:12-2:25.



**Exhibit 7B** (*minute marker 2:22*)

Officer Fanone's protectors then escorted him back to the police line, where he lost consciousness.

Officer Fanone was later transported to the Emergency Room after he regained consciousness. His injuries are described below.

### *Officer Fanone's Injuries*

Officer Fanone sustained significant and painful injuries on January 6, 2021. He experienced excruciating pain each time Rodriguez repeatedly applied a taser to the back of his neck. Officer Fanone can be heard screaming on his body-worn camera, Exhibit 5.2, on three separate occasions—at minute markers 15:19:15, 15:19:17, and 15:19:21-22. The tasing caused burn marks to the back of Officer M.F.'s neck that resulted in scarring.



**Exhibit 9** *(photo taken on March 3, 2021)*

After Officer Fanone was escorted back to the police line, his body-worn camera depicts him collapsing at 15:21:09, followed by another officer announcing, "Officer down!"



**Exhibit 5.2B**
30

Other officers dragged Officer Fanone's limp body inside the Capitol building. One of the officers yelled "We need a medic! We need EMTs now!" as Officer Fanone's unconscious face is slumped over his chest, making it visible in the body-worn camera.



**Exhibit 5.2C**

Officers continue to carry Officer Fanone, as his MPD partner arrives and starts talking to Officer Fanone—"Mike, stay in there buddy. Mike, it's Jimmy, I'm here."



**Exhibit 5.2D**

In the footage, Officer Fanone's partner opens Fanone's vest to help him breathe. One officer addresses Officer Fanone—"Come on, wake up, brother. Talk to me man." Officer Fanone's partner also continues to try to revive him: "Come on, Mike. Come on, buddy, we're going duck hunting soon." Another officer says, "Fanone, Fanone, you alright, brother?"

At time stamp 15:23:32 in the BWC footage, nearly two and a half minutes after his initial collapse, Officer Fanone regains consciousness. His first words are, "Did we take that door back?" Officer Fanone then walked outside where a medic performed a medical assessment.





***Head's Statements***

<u>Statements on Social Media</u>

After the January 6 riots, Head posted on Twitter that he was "[p]roud to have been their [sic]."



**Exhibit 9**

Head also made the following post on Twitter on January 8, seemingly referring to the man with

a confederate flag in the photo he posted.[11]



**Exhibit 10**

Custodial Interview

After he was arrested on April 14, 2021, Head consented to a participate in a custodial interview, which is provided as Exhibit 12. In the interview, Head described how he left Tennessee on the evening of January 5, 2021 to drive to Washington, D.C., but was unwilling to disclose his travel companions. He stated that he was traveling to D.C. "for the rally." Head stated that once

---

[11] The man with a confederate flag in Exhibit 10 is Kevin Seefried, 1:21-cr-00287-TNM-1.

he was there, he mingled and talked to people and then followed people to the Capitol, where things were getting "wild." At the Capitol, Head encountered a "Chinese chick" who was wearing a "press" jacket and had an expensive camera. When they were on the stairs at the Capitol, Head stated that the woman wanted to go up the stairs so that she could take pictures, but everybody was "pushing her around," so Head was "blocking for her." Head then described helping the woman get up the stairs before putting her on a ledge.

Head's description of interacting with a woman wearing a "press" jacket is corroborated in Exhibit 2, which shows a woman wearing a jacket that says "press" on the back following him up the steps at minute marker 1:36.



**Exhibit 2D**

Head then placed the woman on a ledge at 3:08:28 p.m. in Exhibit 3.



**Exhibit 3N** (*screenshot brightened for enhanced visibility*)

Head stated that he did not know what was at the top of the stairs until he got there. Once there, he described being trapped because there were "too many people pushing in; you couldn't get back out." Head said he was pushed to the "barricade line" where everyone was pushing to get in and the police were pushing back. Head said he was pushed all the way to the side, and that he could not breathe because of being "maced."

Head's description of being unable to get out of the tunnel is not reflected in the surveillance footage. After placing the woman on the ledge, people are milling around the entrance to the tunnel, such that Head could have left had he chosen to do so. Instead, Head chose to move forward into the crush of rioters battling police at the barricade line.



**Exhibit 3M** (*screenshot brightened for enhanced visibility*)

When Head was pushed out toward the mouth of the tunnel not long after entering, he chose not to move with the crowd outside the tunnel, but fought to gain his footing and pushed his way back toward the police barricade at 3:10:16 to 3:10:45 p.m., stopping only to put on a gas mask offered to him by a fellow rioter.



**Exhibit 3N** (*screenshot brightened for enhanced visibility*)

Rather than being helplessly trapped in the tunnel, Head chose to stay in the tunnel and battle

police trying to keep rioters out of the Capitol Building. It was not until he was forcibly pushed out that he left, and when he did so, he forcibly dragged Officer Fanone with him.

Head said he eventually left after Trump "told everybody to leave." After being shown photos of himself in the tunnel, Head said that he was not sure if the photos were him and that he did not think he was wearing long-sleeves at the time. Head then said he "didn't want to say too much," and asked some questions about what he was charged with before ending the interview.

## III.    THE CHARGES AND PLEA AGREEMENT

On December 1, 2021, a federal grand jury returned a superseding indictment charging Head with Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2), two counts of Civil Disorder in violation of 18 U.S.C. § 231(a)(3), two counts of Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1), Entering or Remaining in any Restricted Building or Grounds in violation of 18 U.S.C. §§ 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(2), Impeding Ingress and Egress in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(3), Engaging in Physical Violence in a Restricted Building or Grounds in violation of 18 U.S.C. § 1752(a)(4), Impeding Passage Through the Capitol Grounds and Buildings in violation of 40 U.S.C. § 5104(e)(2)(E), and Act of Physical Violence in the Capitol Grounds or Buildings in violation of 40 U.S.C. § 5104(e)(2)(F).

On May 6, 2022, Head pled guilty to Count Four, Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1) (Officer Michael Fanone).

## IV.    STATUTORY PENALTIES

Head now faces sentencing on Assaulting, Resisting, or Impeding Certain Officers in

violation of 18 U.S.C. § 111(a)(1).

As noted by the plea agreement and the U.S. Probation Office, Head faces up to 8 years of imprisonment, a fine up to $250,000, and a term of supervised release of not more than three years for Count Four, Assaulting, Resisting, or Impeding Certain Officers.

## V.       THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

Offense Level

The Government agrees with the Sentencing Guidelines calculation set forth in the PSR. In the PSR, the Probation Office calculated Head's offense level as VI,[12] applying the following enhancements to a base offense level of 14 (U.S.S.G. § 2A2.2(a)):

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(B) | Victim Sustained Serious Bodily Injury | +5 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| U.S.S.G. § 3A1.3 | Physical Restraint | +2 |
| U.S.S.G. § 3E1.1(a) & (b) | Acceptance of Responsibility | -3 |
| **Total Offense Level:** | | **24** |

*See* PSR ¶¶ 92-94; Plea Agreement at ¶ 4(A).

Per the Plea Agreement, Head "reserves the right to challenge the application of U.S.S.G. § 3A1.3 solely on the grounds that his offense did not involve the victim being physically restrained in the course of the offense." Plea Agreement at ¶ 4(A). For the reasons set for below, the facts of this case firmly support the application of the enhancement.

---

[12] In the plea agreement reached by the parties, the Criminal History Category is noted as a V. *See* Plea Agreement, ¶ 4(B). If that had been the case, the guidelines range would have been 92 to 115 months. The government's present allocution for 96 months remains within the guidelines reached in that agreement, even though the parties now agree with Probation, that the accurate calculation would be Category VI.

### *A Two-Level Upward Adjustment for Restraint of a Victim Applies to Head's Assault of Officer Fanone*

Head has objected to the Probation Office's determination that the enhancement for restraint of a victim under U.S.S.G. 3A1.3 applies in this case. ECF 152, at 51. He is wrong. In the case of the codefendant, *United States v. Kyle Young*, 21-cr-291-3 (ABJ), this Court applied the enhancement for Young's restraint of Office Fanone over the Young's objection. It did so even though Young restrained Officer Fanone less forcefully and for a shorter period of time than Head did. *See* Young Sent. Hearing Tr. 8:9 – 10:12. This Court should now apply that enhancement against Head.

Chapter 3 of the Guidelines provides for a two-level, victim-related upward adjustment "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. Application Note 1 to U.S.S.G. § 3A1.3 clarifies that the applicable definition of "physically restrained" is found in the Commentary to U.S.S.G. § 1B1.1: "'Physically restrained' means the forcible restraint of the victim such as by being tied, bound, or locked up." U.S.S.G. § 1B1.1, cmt. n.1(L).  Courts, including the D.C. Circuit, have consistently held that the victim "being tied, bound, or locked up" is not a requirement for physical restraint, but instead a non-exhaustive list of examples of physical restraint. *United States v. Drew*, 200 F.3d 871, 880 (D.C. Cir. 2000) ("the use of the modifier 'such as' in the definition of 'physical restraint' found in § 1B1.1… indicates that the illustrations of physical restraint are listed by way of example rather than limitation") (quoting *United States v. Anglin,* 169 F.3d 154, 163 (2d Cir.1999)); *see also United States v. Bell*, 947 F.3d 49, 55 (3d Cir. 2020) ("[W]e, along with many of our sister circuits, have held that the three examples provided in the definition of physically restrained are not an exhaustive list, but rather only examples of the types of conduct that fall within the meaning of the

term [physically restrained].") (collecting cases from the First, Second, Third, Fourth, Fifth, Nineth, and D.C. Circuits).

Circuit courts have varying approaches to determining whether anyone was "physically restrained" under the Guidelines. *See United States v. Taylor*, 961 F.3d 68, 78 (2d Cir. 2020) (discussing the approaches taken by the Second, Third, Seventh, and Ninth Circuits in cases involving two-level enhancements for use of physical restraint in robberies). The Third Circuit recently developed an approach incorporating various considerations adopted by the other Circuits, including a consideration addressed by the D.C. Circuit, which itself currently has a dearth of caselaw on physical restraint under the Guidelines. *Bell*, 947 F.3d at 56 ("[W]e discern five broad factors that the other circuits have used to evaluate whether the enhancement should be applied and that we, after consideration, adopt here"). The five factors identified by the Third Circuit are:

1. Use of physical force;

2. Exerting control over the victim;

3. Providing the victim with no alternative but compliance;

4. Focusing on the victim for some period of time; and

5. Placement in a confined space.

*Bell*, 947 F.3d at 56.[13] Each factor will be addressed below.

---

[13] The Third Circuit in *Bell* addressed a two-level enhancement for physical restraint pursuant to U.S.S.G. § 2B3.1(b)(4)(B) which reads, "[I]f any person was physically restrained to facilitate commission of the [robbery] offense or to facilitate escape, increase by 2 levels." U.S.S.G. § 2B3.1(b)(4)(B). This enhancement varies a bit from § 3A1.3, which applies "[i]f a victim was physically restrained in the course of the offense." U.S.S.G. § 3A1.3. The Chapter 2 Guideline imposes an additional requirement that the restraint must be imposed "to facilitate commission of the offense [of robbery] or to facilitate escape." *Bell*, 947 F.3d at 60. However, since the Chapter 2 enhancement in *Bell* also refers to "physically restrained" as defined in U.S.S.G. § 1B1.1 (*see Bell*, 947 F.3d at 54–55), *Bell* and similar cases help interpret the meaning of "physically

1. <u>Head used physical force against Officer Fanone.</u>

The D.C. Circuit Court has found that "physical restraint requires the defendant either to restrain the victim through bodily contact or to confine the victim in some way." *Drew*, 200 F.3d at 880 (finding no physical restraint pursuant to U.S.S.G. § 3A1.3 where the defendant ordered his victim to leave her bedroom and walk downstairs at gunpoint, because "[t]he required restraint must, as the language plainly recites, be physical") (citing *United States v. Harris,* 959 F.2d 246, 265 (D.C. Cir. 1992) *abrogated on other grounds by United States v. Stewart*, 246 F.3d 728 (D.C. Cir. 2001)). Here, Head made direct bodily contact with Officer Fanone—in addition to wrapping his arm around Officer Fanone's neck, Head dragged Officer Fanone out of the tunnel and into the violent mob immediately outside the tunnel. Even after they exited the tunnel, Head continued to drag Officer Fanone deeper into the violent mob, holding Officer Fanone while he was being assaulted, including with a taser, by other rioters. *See* Section II.B *supra* (Subsection "Head Dragging Officer Fanone into the Mob," pages 21-25, Exhibits 3K, 3L, 3M, 3N, 5.2A, 6.1A, 7A, and 6.1B).

Similar kinds of bodily contact have been found by courts to involve physical restraint under the Guidelines. *See, e.g., United States v. Plenty*, 335 F.3d 732, 735–36 (8th Cir. 2003) (Section 3A1.3 victim restraint adjustment applied where the defendant dragged the victim by her ankle from her bedroom to her living room, and then dragged her by her hair to the doorway of the house); *United States v. Foppe*, 993 F.2d 1444, 1452–53 (9th Cir. 1993) (defendant forcibly restrained two women when he held up a bank by dragging one woman by the neck to a teller station while pushing a hairbrush into her back (pretending it was a gun), and he grabbed another

---

restrained" as it is used in § 3A1.3.

woman, a customer service representative, as well); *see also United States v. West*, No. 20-3723, 2022 WL 321136, at \*1 (8th Cir. Feb. 3, 2022) (unpublished) ("[Defendant] West also forcibly restrained Minor Victim D [pursuant to  § 3A1.3] when he prevented her from leaving a hotel room by grabbing her around the neck").   Head's conduct falls within even the narrowest interpretation of restraining the victim through "bodily contact."

   2.   Head exerted control over Officer Fanone.

      Consistent with the definition of "restrained" and examples of being physically restrained provided in the Guidelines ("being tied, bound or locked up"), a defendant should be deemed to have engaged in actions that restrict a victim's freedom of movement in some manner." *Bell*, 947 F.3d at 57; *see also Taylor*, 961 F.3d at 78 ("'Restraint' is principally defined as 'to hold back; to check; to hold from action, proceeding, or advancing'") (internal citations omitted); *Foppe*, 993 F.2d at 1452–53 ("The dictionary defines 'restraint' as (1) the act of holding back from some activity or (2) by means of force, an act that checks free activity or otherwise controls… 'Forcible' means effected by the use of force") (internal citations omitted); *see, e.g., United States v. Roberts*, 898 F.2d 1465, 1470 (10th Cir. 1990) ("We have no difficulty in concluding that a victim who is held around the neck at knifepoint is denied freedom of movement so as to be physically restrained [pursuant to § 3A1.3].").   Dragging a victim from one location to another while they struggle to break free and escape forcibly denies the victim such freedom of movement. *See, e.g., Plenty*, 335 F.3d at 736 (defendant "exercise[d] control over [the victim] that prevented her freedom of movement when he  dragged [her] off the bed and through the house").

      Here, Head restricted the officer's freedom of movement in a myriad of ways.  For instance, Head dragging Officer Fanone out of the LWT tunnel further into the violent mob prevented

Officer Fanone from being able to return to the relative safety of being surrounded by his fellow

officers still holding their line in the LWT tunnel:

> That initial period of time where I was pulled, you know, off that line was kind of a blur. I just remember getting violently assaulted from every direction and eventually found myself out 250, maybe 300 feet away from the mouth of the tunnel where the other officers were at. I knew that I was in – I was up shit creek without a paddle.

*Testimony of USCP Sgt. Gonell, MPD Officer Fanone, USCP Officer Dunn, and MPD Officer*

*Hodges*: Hearing Before the House Select Comm. to Investigate the January 6th Attack on the

United States Capitol, 117 Cong. (July 27, 2021) (Statement of Officer Michael Fanone), available

at https://www.c-span.org/video/?513434-1/capitol-dc-police-testify-january-6-attack (hereinafter

"*Officer Fanone's Congressional Testimony*").

Head also prevented Officer Fanone from protecting himself from the countless assaults

being perpetrated against him by other rioters:

> Because I was among a vastly outnumbered group of law enforcement officers protecting the Capitol and the people in it, I was grabbed, beaten, tased, all while being called a traitor to my country. I was at risk of being stripped of, and killed with, my own firearm as I heard chants of, 'Kill him with his own gun!' I can still hear those words in my head now. . . I just remember getting violently assaulted from every direction and eventually found myself out 250, maybe 300 feet away from the mouth of the tunnel… I was trying to push guys off of me, create some space. All the while I recognized the fact that there were individuals that were trying to grab a hold of my gun. I remember [one] of them distinctly lunging at me time and time again trying to grab my gun. And I heard people in the crowd yelling, 'Get his gun, kill him with his own gun,' and words to that effect.

*Id.* As noted above, Head specifically prevented Officer Fanone from protecting himself from

Rodriguez, who repeatedly tased him. Officer Fanone has stated, "I was struck with a taser device

at the base of my skull numerous times, and they continued to do so until I yelled out that 'I have

kids.'" *Id*. Based on the officer's body-worn camera footage and the distinct screams of pain he

emitted each time he was tased, Officer Fanone was tased multiple times.[14] Accordingly, Head restricted Officer Fanone's freedom of movement and exerted control over Officer Fanone.

3. Head provided Officer Fanone with no alternative but compliance.

In *United States v. Rosario*, 7 F.3d 319 (2d Cir. 1993), the Second Circuit affirmed the application of a Chapter 2 enhancement for the use of physical restraint in a robbery where the defendant had stood on his victim's throat (pinning him to the ground by his neck) while stealing the victim's wallet and keys, and the victim "could do nothing about [his] situation because of the physical restraint." *Id.* at 320-21 (internal citations omitted).

Here, Head's restraint forced Officer Fanone to comply with exactly what Head and the riotous mob wanted—for the Officer to break away from the police line and Capitol doors so that other rioters would have a better chance at successfully storming the Capitol Building. And like the victim in *Rosario*, Officer Fanone similarly could do nothing about his situation because of Head's physical restraint. Officer Fanone was stuck in the dangerous, rioting crowd as Head dragged him further away from fellow officers who could have helped him. Head also held the officer close so that he could not defend himself against various assaults, as discussed above, which further prevented Officer Fanone from returning to defendant the Capitol Building.  Head left Officer Fanone with no alternative but compliance.

4. The brief duration of the restraint does not preclude application of the enhancement.

Another consideration is the duration of the defendant's restraint of the victim. *Bell*, 947 F.3d at 59. While sustained restraint may militate in favor of applying the enhancement, it is not

---

[14] Officer Fanone can be heard screaming on his body-worn camera on three separate occasions at minute markers 15:19:15, 15:19:17, and 15:19:21-22 on Exhibit 5.2.

required. *See, e.g., United States v. Coleman*, 664 F.3d 1047, 1050–51 (6th Cir. 2012) ("We likewise reject [the defendant's] 'sustained focus' requirement"); *United States v. Checora*, 175 F.3d 782, 791 ("[W]e conclude that a physical restraint occurred, within the meaning of section 3A1.3, when [two defendants] tackled [the victim] to the ground to prevent his escape… The fact the restraint of [the victim] was brief does not alter our conclusion."); *Foppe*, 993 F.2d at 1452–53 ("The Guidelines do not distinguish between long and short-term restraint, and neither will we"); *see also United States v. Rowsey*, 431 F. Supp. 2d 903, 907–09 (N.D. Ind. 2006) (victim of a bank robbery was physically restrained even though the duration of the restraint was only about two minutes, because "[i]t is the fact of restraint-not the duration thereof-that is controlling").

In any event, even under the Third Circuit's analysis, the duration of the restraint is only one factor and should be balanced against the other factors used to determine whether a victim was "physically restrained" under the Guidelines. *Bell*, 947 F.3d at 56. Also, the Court in *Bell* made clear that "[n]o single factor is dispositive nor does any factor carry more weight than any other factor; rather, district courts should balance all of these factors." *Id.* at 60. Here, while Head's restraint of Officer Fanone was brief, context matters greatly. Not only did Head grab the officer and drag him to another more dangerous location, but this restraint occurred in the middle of a riot—Head holding and dragging Officer Fanone left him vulnerable to additional assaults as he was surrounded by other hostile rioters.   In that context, although the duration of the restraint was brief, that brief period coincided with the moment when Officer Fanone was at his most vulnerable. Consequently, the brevity of the restraint should not preclude application of the enhancement.[15]

---

[15] In Head's Notice of Objections to Presentence Investigation Report at 3 (no ECF number), Head states that a "brief holding" of a victim during an assault does not qualify for a § 3A1.3 sentencing enhancement, citing *United States v. Mikalajunas*, 936 F.2d 153, 155 (4th Cir. 1991)

5. Head, in conjunction with the rioting crowd, placed Officer Fanone in a confined
space.

The final consideration noted by the Third Circuit is whether "the perpetrator's act…

enclose[es] or confin[es] the victim in a space or with a barrier, actual or threatened." *Bell*, 947

F.3d at 60 (internal quotation marks and citations omitted).

Head dragged Officer Fanone into an angry and violent mob of people who surrounded

him and prevented him from escaping.  Such behavior—blocking egress—is also considered in

determining that a victim was "physically restrained" pursuant to U.S.S.G. § lBl.1. For instance,

in *United States v. DeLuca*, 138 F.3d 24 (1st Cir.  1998) the court found that the victim was

"physically restrained" by two of the defendant's co-conspirators where one co-conspirator

"pushed [the victim] as he attempted to leave the hallway in which he was being assaulted and

[another co-conspirator], throughout the encounter, stood at the hallway door barring egress by

[the victim]." The court concluded that the victim was confined even though he was never "tied,

bound, or locked up," because "[t]he examples listed in the guideline definition of 'physically

---

(holding that § 3A1.3 sentencing enhancement did not apply when defendant briefly held a
victim during a fatal stabbing). While the court in *Mikalajunas* did consider duration of the
restraint as a factor, the court ultimately held that the restraint was not sufficient because the act
of fatally stabbing a victim generally involves restraint:

> Stabbing, however, is of a different nature. The very act of stabbing normally will
> involve some physical restraint…Every murder involves the ultimate restraint. Such
> terminal restraint is simply an element of the crime of homicide…  An upward
> adjustment for restraint is to be made in the context of an act which adds to the basic
> crime. Furthermore, the examples of physical restraint in the guidelines, while not all
> inclusive, imply that the guidelines intend an enhancement for something other than a
> brief holding as part of a stabbing.

*Mikalajunas*, 936 F.2d at 156. Plainly, that reasoning does not apply here, where Officer Fanone
was very fortunately not the victim of a homicide. And unlike homicide, an assault does not
always involve a restraint.

restrained' [in U.S.S.G. § lBl.1, comment. (n.1 (i))] are merely illustrative . . . not exhaustive." *Id.* at 39. Head dragged Officer Fanone to a space where not only Head, but innumerable other rioters could successfully confine the officer, preventing his escape until other rioters came to his rescue.

    6. <u>Application of the enhancement punishes conduct that is not inherently part of the offense of conviction.</u>

Application Note 2 for U.S.S.G. § 3A1.3 notes that the restraint-of-a-victim adjustment should not be applied where either "the offense guideline specifically incorporates this factor" or "where the unlawful restraint of a victim is an element of the offense itself (*e.g.*, this adjustment does not apply to offenses covered by §2A4.1 (Kidnapping, Abduction, Unlawful Restraint))." U.S.S.G. § 3A1.3 cmt. n. 2. In order to determine whether "restraint" is an element of the offense, courts look to the statutory definition of the offense. *United States v. Benitez-Torres*, 73 F. App'x 78 (5th Cir. 2003) (citing *United States v. Gaytan*, 74 F.3d 545, 560 (5th Cir. 1996)). When conducting this inquiry, courts should consider whether "the act of physical restraint 'adds to the basic crime.'" *United States v. Wilson*, 198 F.3d 467, 472–73 (4th Cir. 1999) (quoting *Mikalajunas,* 936 F.2d at 156). The Tenth Circuit has also indicated that courts "must determine whether the offense *conduct* specifically addressed whether the victim was physically restrained" in determining whether a Guideline enhancement incorporates the victim restraint adjustment. *United States v. Troup*, 426 F. Supp. 3d 1072, 1136 (D.N.M. 2019) (quoting *United States v. Joe*, 696 F.3d 1066, 1071 (10th Cir. 2012) (emphasis in original).

Here, the only specific offense characteristic under Section 2A2.2 is that for serious bodily injury under Section 2A2.2(b)(3)(B). That means that Head's restraint of Officer Fanone is not accounted for by application of Section 2A2.2, or by any other enhancement, for that matter. *See United States v. Davis*, No. 20-30438, 2022 WL 226000, at *2 (5th Cir. Jan. 24, 2022), *cert. denied*,

142 S. Ct. 2767 (2022) (rejecting defendant's contention that the serious bodily injury enhancement in U.S.S.G. § 2A2.2(b)(3)(B) incorporates physical restraint as a factor and noting that the Fifth Circuit has previously upheld application of the victim restraint adjustment under § 3A1.3 when the bodily injury enhancement applied.).

Additionally, unlawful restraint of a victim is not an element of  18 U.S.C. § 111(a). Section 111(a) criminalizes "forcibly assault[ing], resist[ing], oppos[ing], imped[ing], intimidat[ing], or interfer[ing] with" an officer while he is engaged in the performance of official duties.  Not all such assaults include physically restraining a victim.  As noted above, restraint is principally defined as "'to hold back; to check; to hold from action, proceeding, or advancing." *Taylor*, 961 F.3d at 78. Hence it is clear that while assault involves some force, but it does not necessarily involve restraint. Physical force is distinct from qualifying physical "restraint." *Id*. at 78-79 (citing *Rosario*, 7 F.3d at 321 ("[M]ere physical contact with the victim does not inevitably amount to physical restraint")).

For instance, in *United States v. Wilson*, 198 F.3d 467 (4th Cir. 1999) the court upheld the two-level physical restraint enhancement for a carjacking, noting that physical restraint was neither an element of carjacking nor "incorporated into the base offense level for robbery." Id.  at 472 (4th Cir. 1999). By contrast, the Court explained that the restraint adjustment was not applicable to a conviction for murder, because "[e]very murder involves the ultimate restraint[, and s]uch terminal restraint is simply an element of the crime of homicide." *Id*. (quoting *Mikalajunas*, 936 F.2d at 156). Fortunately, Officer Fanone survived the assault on January 6, largely because of other rioters who belatedly came to his assistance, and no thanks to Head.

Here, in addition to engaging in other conduct that also constitutes assaults (such as striking

49

at officers using a riot shield), Head purposely grabbed, dragged, and held Officer Fanone to get and keep him away from the police line and to force him into the violent mob of rioters and trapped him away from his fellow officers and potential help.  Such behavior, calculated not just to hurt the victim but to trap him, justifies application of the restraint enhancement.

Twice in the context of Capitol Riot assault cases, judges have applied this restraint enhancement. In *United States v. Thomas Webster*, 21-cr-208, Judge Mehta found the enhancement applicable when the defendant tackled an officer on the West Plaza during an assault. Additionally, this Court recently applied the restraint enhancement to Head's co-defendant, Kyle Young, who restrained Officer Fanone for less time than Head did. *See* Young Sent. Hearing Tr. 8:5-11:13 ("He used his physical strength and force to exert control over the officer's body to restrict the officer's movements, to hold him back, to prevent him from using that arm…. The fact that he was rendered unable to fend the rioters off for even that short period of time enabled another individual to reach in and strip him, not only of his badge, but his lifeline, his radio.")

The U.S. Probation Office calculated Head's criminal history as category VI, which was not disputed in Head's Notice of Objections to Presentence Investigation Report. PSR ¶ 145. Accordingly, based on Head's total adjusted offense level, after acceptance of responsibility, at 24, Head's Guidelines imprisonment range is capped at the statutory maximum of 96 months' imprisonment, as the guidelines range would otherwise be 100 to 125 months. PSR ¶ 145.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

By operation of 18 U.S.C. § 3553(a), this Court must consider, *inter alia*, the nature and circumstances of the offense,  § 3553(a)(1); the history and characteristics of the defendant, *id.*; the need for the sentence to reflect the seriousness of the offense and promote respect for the law,

§ 3553(a)(2)(A); the need for the sentence to afford adequate deterrence, § 3553(a)(2)(B); and the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6). In this case, as described below, all of the Section 3553(a) factors weigh in favor of the recommended sentence.

### A.      Nature and Circumstances of the Offense

The attack on the U.S. Capitol, on January 6, 2021 is a criminal offense unparalleled in American history. It represented a grave threat to our democratic norms; indeed, it was one of the only times in our history when the building was literally occupied by hostile participants. By its very nature, the attack defies comparison to other events.

The nature and circumstances of Head's crimes weigh heavily towards a significant term of incarceration. As described in thorough detail above, Head's repeated assaults against police officers on the LWT mark him as one of the most violent rioters who attacked the Capitol on January 6. His decision to drag Officer Fanone into a violent crowd after yelling "I got one!" nearly cost that officer his life. After Officer Fanone was repeatedly tased, robbed, and threatened with his life, Head persistently tried to regain control of the officer until a member of the crowd forcibly pushed him off. Head's crimes fully support a custodial sentence at the statutory maximum, which is well below the bottom of the unadjusted Sentencing Guidelines range, as the government has requested.

### B.  Head's History and Characteristics

Head was a construction laborer who was employed in Kingsport, Tennessee until his arrest. PSR ¶ 129. The accounting of his criminal history takes up twenty-nine pages and fifty-three paragraphs of the pre-sentence investigation report. PSR ¶¶ 54-105. Although most of his

convictions were for non-violent misdemeanors and infractions, not all were. Among his crimes

are the following:

- In April 2001, Head was sentenced in Sullivan County, Tennessee to 11 months, 29 days (suspended except 10 days) for domestic assault and reckless endangerment. Head's conduct involved swerving his car toward his girlfriend's car when he passed her on the road, almost causing her to run off the road. Head then followed her after she pulled over, came to her open driver's window and held up a knife, demanding that she and her two passengers get out of the car. When the victim remained in her vehicle, Head reached into the car, took the keys out of the ignition, and returned to his vehicle and left. PSR ¶ 63.

- In May 2006, Head was sentenced in Sullivan County, Tennessee to 11 months, 29 days (suspended except for 120 days) for assault. The incident involved Head and his girlfriend getting into an argument at a bar, resulting in her leaving and going home. She locked the door out of fear that Head would assault her. Head arrived at the home, kicked down the door, and grabbed the victim, forcing her to the ground with his hand around her neck, choking her. He then threatened her with sexual assault. She was able to kick him away, but he responded by kicking her in the upper back and legs while wearing steel-toed boots. The victim had marks on her left arm and neck and complained of pain in her back and legs. She was transported to the hospital. PSR ¶ 71.

- In May 2006, Head was sentenced in Sullivan County, Tennessee to 11 months, 29 days (suspended as to all but 120 days) for assault. The incident involved a prior assault with the same girlfriend in the incident described in the paragraph above. This assault involved Head punching his girlfriend in her face, resulting in a swollen lip and nose. PSR ¶ 72.

- In July 2011, Head was sentenced in Sullivan County, Tennessee to 11 months, 29 days for domestic assault. In this incident, Head assaulted and threatened the same girlfriend in the two prior incidents described above. Head first threw food at the victim. When her young son yelled at him to stop, Head grabbed him by the coat and pushed him before turning back to the victim and striking her in the face, resulting in a large, red mark. The victim's other son then pushed Head out of the home. Head responded by breaking the sliding glass door of the home. One of the victim's sons yelled at Head, who assaulted him, resulting in several small cuts on the son's arms and hand. While at the home, Head flashed a gun and threatened to shoot the victim. PSR ¶ 75.

In addition, Head has numerous other convictions for driving under the influence,

possession and the abuse of narcotics, and theft.  Plainly, unlike many other January 6 defendants,

Head's crimes on January 6 were not the product of an isolated violent event in an otherwise law-

abiding life. They came, instead, after a long series of criminal offenses, including prior violent

offenses. Head's lengthy and substantial criminal history weighs heavily in favor of a lengthy term

of incarceration.

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds, and all that it involved, was an attack

on the rule of law. As with the nature and circumstances of the offense, this factor supports a

sentence of incarceration. Head's criminal conduct, assaulting a police officer who was in the

course of performing his official duties, is the epitome of disrespect for the law. Police officers

were overwhelmed, outnumbered, and in some cases, including Officer Fanone's case, in serious

danger.

### D.     The Need for the Sentence to Afford Adequate Deterrence

Deterrence encompasses two goals: general deterrence, or the need to deter crime

generally, and specific deterrence, or the need to protect the public from further crimes by this

defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir.

2010).

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by

others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[16] The demands of general

deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out

---

[16] *See* 18 U.S.C. § 2331(5) (defining "'domestic terrorism'").

of the violent riot at the Capitol. *See United States v. Kyle Young,* 21-cr-291-3, Sent. Hearing Tr. 62:14-18 ("There is possibly no greater factor that this Court must consider. What happened on January 6 and the effort to keep that spirit alive a year and a half later is the utter antithesis of what America stands for. It is the pure embodiment of tyranny and authoritarianism. So, yes, deterrence has to be a factor in this sentence even today.")

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of the recommended sentence. His conviction in this case for assaulting a police officer in the context of a violent attack on the democratic process is significantly more serious than his prior convictions. As his prior convictions and prison sentences did not deter his criminal conduct on January 6, the need for specific deterrence supports the government's recommendation for a lengthy term of imprisonment.

### E.   The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). Accordingly, courts must give "respectful consideration to the Guidelines." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007 "[W]here judge and Commission *both* determine that the Guidelines sentences is an appropriate sentence for the case at hand, that sentence likely reflects the § 3553(a) factors (including its 'not greater than necessary' requirement)," and that "significantly increases the likelihood that the sentence is a reasonable one." *Rita*, 551 U.S. at 347 (emphasis in original).

Here, while the Court must balance all the § 3553 factors to fashion a just and appropriate

sentence, the Guidelines unquestionably provide the most helpful benchmark.

### F.      Unwarranted Sentencing Disparities

Finally, as to 18 U.S.C. § 3553(a)(6)—the need to avoid unwarranted sentencing disparities—the crimes that Head and others like him committed on January 6 are unprecedented. Mechanical comparison to assault cases in other non-January 6 contexts would be a disservice to the magnitude of what the riot entailed and signified, because these crimes defy comparison to other obstructive and assaultive conduct in other contexts. January 6 police officer assault cases that have already proceeded to sentencing provide helpful reference points.

As of the date of this sentencing memorandum, nineteen Capitol riot defendants have been sentenced for assaulting police officers.[17] Among those sentenced for assault on law enforcement, six are comparable to the present case, as they had assault as their lead charge and their assaultive conduct was primarily centered in and around the Lower West Terrace.[18] Head's co-defendant,

---

[17] Some of those cases, which encompass different charges than the instant case, do not include conduct as serious as Head's conduct, or had defendant's with less significant criminal history, include: *United States v. Fairlamb*, 21-cr-120 (RCL), 41-month sentence; *United States v. Languerand*, 21-cr-353 (JDB), 44-month sentence; *United States v. Creek*, 21-cr-645 (DLF), 27-month sentence; and *United States v. Miller*, 21-cr-75 (RDM), 33-month sentence.

[18] Those cases are: *United States v. Devlyn Thompson*, 21-cr-461 (defendant sentenced to 41 months by Judge Lamberth for violating 18 U.S.C. § 111(a) and (b) when he assaulted an officer in the Lower West Terrace tunnel with a baton; defendant had criminal history category of I and cooperated with the government early in the Capitol Riot investigation); *United States v. Duke Wilson*, 21-cr-345 (defendant sentenced to 51 months by Judge Lamberth for violating 18 U.S.C. § 1512(c)(2) and § 111(a)(1) when he assaulted officers in the Lower West Terrace tunnel; defendant had criminal history category of I); *Untied States v. Robert Palmer*, 21-cr-328 (defendant sentenced to 63 months by Judge Chutkan for violating 18 U.S.C. §111(a)(1) and (b) when he threw various objects at officers defending the Lower West Terrace tunnel and deployed the contents of a fire extinguisher at the police line; defendant had criminal history category of I and pled guilty early in the investigation); *United States v. Cody Mattice*, 21-cr-657-1 (defendant sentenced to 44 months by Chief Judge Howell for violating 18 U.S.C. §111(a)(1) when he deployed a chemical irritant at officers at the mouth of the Lower West Terrace tunnel; defendant had criminal history category I); *United States v. James Mault*, 21-cr-

Kyle Young, is Head's closest comparator.

In *United States v. Kyle Young*, 21-cr-291-3 (ABJ), the defendant assaulted officers in the LWT tunnel by throwing a speaker and jabbing a pole toward the police line. Young also held a strobe light toward the police officers trying to fend of the rioters in the tunnel and handed a taser to another rioter, who eventually repeatedly applied the taser to the back of Officer Fanone's neck. Young then assaulted Officer Fanone by restraining his wrist and holding it away from his body at a pivotal moment in the attack on the Officer, amid chants to kill the officer with his own gun. Finally, Young assaulted Officer M.M., another officer who had been pulled into the crowd. All of these actions were taken in the presence of Young's minor son, who was with him that day on the grounds of the Capitol. Young pled guilty to one count in violation of 18 U.S.C. § 111(a). This Court imposed an 86-month sentence on Young.

Like Young, Head's actions involved assaulting police in the tunnel, including using an improvised weapon (in Head's case a plastic riot shield) before participating in the assault on Officer Fanone, which resulted in serious injuries. However, Head's role in the attack on Officer Fanone was more severe than Young's in a few ways. First, Head's act of dragging the officer into the violent mob precipitated a sustained assault by members of the mob that could have cost the officer his life. Had Head not pulled Officer Fanone into the mob, Young and others would have never had the opportunity to participate in the assault. Second, Head took the act of using an improvised weapon against police while in the tunnel one step further than Young by actually

657-2 (defendant sentenced to 44 months by Chief Judge Howell for violating 18 U.S.C. §111(a)(1) when he deployed a chemical irritant at officers at the mouth of the Lower West Terrace tunnel; defendant had criminal history category I) and *United States v. Kyle Young*, 21-cr-291-3 (defendant sentenced to 86 months by this Court for assault committed against Officer Fanone; defendant had criminal history category of V).

making physical contact with a police officer on the front lines of the tunnel. Specifically, Head used a riot shield to press against Officer Fanone for a sustained period of time, striking the Officer's hand when he tried to brace himself on the doorframe. Third, Head, unlike Young, returned to try to continue the assault after members of the crowd surrounded the Officer to protect him. It was not until one of these "protectors" forcibly pushed Head away that Head ceased his efforts. Finally, Head's criminal history is more lengthy and violent than Young's criminal history, warranting a longer sentence.

One January 6 assault case has garnered a sentence longer than the recommended sentence here: *United States v. Webster*, 21-cr-208 (APM). The defendant was convicted at trial of multiple counts, including one count of violating 18 U.S.C. 111(b) for use of a flagpole in an assault against MPD Officer Rathbun. Judge Mehta imposed a 120-month sentence. That case, like this one, involved a protracted physical assault against a single officer who the defendant had picked out from the police line.  The *Webster* case garnered a higher guidelines range (210 to 262 months), not only because the counts of conviction had a higher offense level (an additional 2 points for conviction under 18 U.S.C. § 111(b) and an additional 4 points for use of dangerous weapon), but also because Webster's additional conduct required several base offense level adjustment not present in the instant case. Specifically, Webster received a four-point enhancement for use of body armor while committing a crime of violence and a two-point enhancement for deleting information from his cellphone. And, of course, Head, like his co-defendant Young, should receive a three-point reduction for acceptance of responsibility, which did not apply to defendant Webster, who took his case to trial.

Accordingly, the instant recommendation does not constitute an unwarranted sentencing

disparity.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). Two general restitution statutes provide such authority. First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096. Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

The VWPA and MVRA share certain features. Both require that restitution "be tied to the loss caused by the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA); *see United States v. Clark*, 747 F.3d 890, 897 (D.C. Cir. 2014) (restitution under the MVRA limited to the "offense of conviction" under *Hughey*). Both require identification of a victim, defined in both statutes as "a person directly and proximately harmed as

a result of" the offense of conviction.[19] *See* 18 U.S.C. § 3663(a)(2) (VWPA); 18 U.S.C. § 3663A(a)(2). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; § 3663(b); § 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019). The relevant inquiry is the scope of the defendant's conduct and the harm suffered by the victim as a result. *See Emor*, 850 F. Supp. 2d at 202. The use of a "reasonable estimate" or reasonable approximation is sufficient, "especially in cases in which an exact dollar amount is inherently incalculable."[20] *United States v. Gushlak*, 728 F.3d 184, 196 (2d Cir. 2013); *see United States v. Sheffield*, 939 F.3d 1274, 1277 (11th Cir. 2019) (estimating the restitution figure is permissible because "it is sometimes impossible to determine an exact restitution amount") (citation omitted); *United States v. James*, 564 F.3d 1237, 1246 (10th Cir. 2009) (restitution order must identify a specific dollar amount but determining that amount is "by nature an inexact science" such that "absolute precision is not required") (citation omitted); *United States v. Burdi*, 414 F.3d 216, 221 (1st Cir. 2005) (same); *see also Paroline v. United States*, 572 U.S. 434, 459 (2014) (observing in the context of the restitution provision in 18 U.S.C. § 2259 that the court's job to "assess as best it can from available evidence the significance of the individual defendant's conduct in light of the broader casual process that produced the victim's losses . . . cannot be a precise mathematical inquiry").

---

[19] The government or a governmental entity can be a "victim" for purposes of the VWPA and MVRA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

[20] The sentencing court should "articulate the specific factual findings underlying its restitution order in order to enable appellate review." *Fair*, 699 F.3d at 513.

The statutes also differ in significant respects. As noted above, the VWPA is a discretionary restitution statute that permits, but does not require, the sentencing court to impose restitution in any case where a defendant is convicted under Title 18 or certain other offenses in Title 21 or Title 49. 18 U.S.C. § 3663(a). In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). By contrast, as noted above, the MVRA applies only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'" *Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without respect to a defendant's ability to pay.

Applying these principles to this case leads to the conclusion that Head should be required to pay at least $2,000 in restitution, though the Court should defer entry of a restitution order at this time. The VWPA and MVRA provide that restitution ordered under Section 3663 "shall be issued and enforced in accordance with section 3664." 18 U.S.C. § 3663(d); 18 U.S.C. § 3663A(d). This Court should order Head to pay restitution to the MPD, the employer of Officer Fanone, to the extent it paid any expenses for his medical treatment. *See* 18 U.S.C. § 3664 (j)(1) ("If a victim has received compensation from insurance or any other source with respect to a loss, the court shall order that restitution be paid to the person who provided or is obligated to provide the compensation.") The Government requests that any restitution order that takes into account losses suffered by the MPD as a result of Head's attack on the officer be delayed for 90 days so it can determine those costs borne by the entity. *See* 18 U.S.C. § 3664(a)(5).

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of imprisonment of 96 months, three years of supervised release, at least $2,000 in restitution, and the mandatory $100 special assessment for each count of conviction.

Respectfully submitted,

MATTHEW M. GRAVES
ACTING UNITED STATES ATTORNEY

BY:   /s/ *Cara A. Gardner*
CARA A. GARDNER
Assistant United States Attorney
D.C. Bar 1003793
U.S. Attorney's Office
601 D Street, N.W.
Washington, D.C. 20001
202-252-7009
Cara.Gardner@usdoj.gov

  /s/
KIMBERLY L. PASCHALL
Assistant United States Attorney
D.C. Bar No. 1015665
601 D St, N.W.,
Washington, D.C. 20001
202-252-2650
Kimberly.paschall@usdoj.gov

61

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on October 17, 2022, I served a copy of this pleading on defendant's counsel through the Court's electronic filing system.

<u>*/s/ Cara A. Gardner*</u>
Cara A. Gardner
Assistant United States Attorney